Filed 8/25/17 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SABIC INNOVATIVE PLASTICS US, LLC,<br>ET AL.,<br><br>    Defendants and Respondents. | D070553<br><br><br>(Super. Ct. No. 30-2008-00078246)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITIONS FOR<br>REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The petitions for rehearing are DENIED.

1.      It is ordered that the opinion be modified to add the following as footnote 2

at the end of the first paragraph on page 7 (ending with "our disposition in this appeal"),

which will necessitate renumbering of all subsequent footnotes and footnote references:

2      In several petitions for rehearing, defendants proffer various
arguments, not previously raised in this appeal, why they believe they
should ultimately prevail on the District's causes of action. We express no
opinion on those arguments. In reversing the trial court's orders granting
summary adjudication as to certain causes of action, we have concluded
only that the *existing* record does not support summary adjudication of
those causes of action. We express no opinion whether motions for
summary adjudication based on different evidence, directed toward
different elements of the claims, or asserting different affirmative defenses
would be successful. The new arguments raised in defendants' petitions for
rehearing must be directed to the trial court in the first instance. We will

not consider them for the first time in this appeal after our opinion has been filed. (See *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1013.)

2. It is further ordered that the opinion be modified to delete the last sentence of the only complete paragraph on page 55 ("UCI has not raised these affirmative defenses or limitations on liability, and we express no opinion on their applicability") and replace it with the following: "UCI did not raise these affirmative defenses or limitations on liability in its motion for summary adjudication in the trial court, and it has not shown in its briefing in this court that we may affirm based on any of these theories. We express no opinion on their ultimate applicability or whether UCI could obtain summary adjudication based on any affirmative defenses or limitations on liability based on a properly argued and supported motion."

3.     It is further ordered that the opinion be modified to add the following as footnote 24 at the end of the only complete paragraph on page 75 (ending with "as to the District's negligence claim"), which will necessitate renumbering of all subsequent footnotes:

24    In a petition for rehearing, GE Aviation argues that this conclusion requires affirmance of the court's orders granting summary adjudication of the District's claims under the OCWD Act and for nuisance because those claims also require a showing that GE Aviation contaminated the soil or groundwater at the site. GE Aviation did not make this argument, or any site-specific argument regarding the District's claims under the OCWD Act and for nuisance, in its briefing in this appeal. We therefore will not consider it for the first time on rehearing. (See *Conservatorship of Susan T., supra*, 8 Cal.4th at p. 1013.)

**There is no change in the judgment.**

_____

BENKE, Acting P. J.

Copies to: All parties

3

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT, | D070553 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 30-2008-00078246) |
| SABIC INNOVATIVE PLASTICS US, LLC, et al., | |
| Defendants and Respondents. | |

CONSOLIDATED APPEALS from judgments of the Superior Court of Orange County, Nancy Wieben Stock, Judge.  Affirmed in part; reversed in part and remanded with directions.

Connor Fletcher & Hedenkamp, Edmond M. Connor, Douglas Aaron Hedenkamp; Miller & Axline, Duane C. Miller, Michael Dana Axline and Justin Morgan Massey, for Plaintiff and Appellant.

Squire Patton Boggs, Adam R. Fox, Helene Huang Yang and Marisol Corral Mork, for Defendants and Respondents Sabic Innovative Plastics US, LLC, and General Electric Company.

Hennelly & Grossfeld and Paul T. Martin for Defendant and Respondent Emerson Electric Company.

Beveridge & Diamond and Gary J. Smith for Defendant and Respondent UNISYS Corporation.

Newmeyer & Dillion and John E. Van Vlear for Defendant and Respondent GE Aviation Systems, LLC.

WFBM, Sean C. McGah and Sage R. Knauft for Defendant and Respondent Marotta Controls, Inc.

Morrison & Foerster and Peter Hsaio; Call & Jensen and Joshua G. Simon for Defendant and Respondent Ricoh Electronics.

Demetriou Del Guercio Springer & Francis, Brian D. Langa and Michael Anthony Francis for Defendant and Respondent Universal Circuits, Inc.

Hinson & Gravelle and Douglas Arthur Gravelle for Defendant and Respondent ICI Americas, Inc.

Bassi, Edlin, Huie & Blum and Paul David Rasmussen for Defendant and Respondent Bell Industries, Inc.

Kutak Rock and Jad Terrell Davis for Defendant and Respondent Sanmina Corporation.

Dykema Gossett and John Anthony Ferroli for Defendant and Respondent Borgwarner Morse TEC Inc.

McGrath North Mullin & Kratz and John A. Andreasen; McGuireWoods and Leslie Mark Werlin for Defendant and Respondent Beatrice Companies, Inc.

Ring Bender, J. W. Ring, Philip M. Bender and Christine L. Hein for Defendant and Respondent Gallade Chemical, Inc.

Ring Bender and Norman A. Dupont for Defendants and Respondents DRSS-1 LLC, and Brenntag Pacific, Inc.

Lewis, Brisbois, Bisgaard & Smith and James Angelo Geocaris for Defendant and Respondent Accurate Circuit Engineering, Inc.

Morris Polich & Purdy and Christopher Geoffrey Foster for Defendant and Respondent Dyer Business Associates, LP.

Musick Peeler & Garrett and Steven J. Elie for Defendant and Respondent Steelcase, Inc.

Morgan Lewis & Bockius, David Louis Schrader and Yardena R. Zwang-Weissman for Defendant and Respondent ITT Corporation.

Wood Smith Henning & Berman, David Ferguson Wood and Jade Tran for Defendant and Respondent Embee, Inc.

Morrison & Foerster and Peter Hsaio for Defendant and Respondent BASF Corporation.

The Orange County Water District (District) was created by the California Legislature to protect and manage groundwater supplies within its territory, which covers most of Orange County, California.  The District and other regulatory agencies have long been aware of localized groundwater contamination caused by hazardous substance releases at various sites in the so-called "South Basin" area of Orange County.  The

3

hazardous substances in question include various volatile organic compounds (VOC's) and percholorate. A number of these sites have been the subject of government investigations and remediation efforts over the past three decades.

In 1998, two VOC's, tetrachloroethylene (also known as perchloroethylene or PCE) and trichloroethylene (TCE), were detected in groundwater drawn from a drinking water well in the South Basin area operated by the Irvine Ranch Water District (IRWD). Three years later, perchlorate was also detected in the well. The District believed these detections reflected more extensive groundwater contamination than it had previously been aware of. The District undertook efforts to identify the source of groundwater contamination and engaged consultants to recommend further avenues of investigation. The District's goal was to determine the extent of groundwater contamination in the South Basin area and develop a plan to remediate it. Although the District's investigation has continued, it had not yet developed a final treatment plan or remediated any contamination by the time of the underlying litigation.

During its investigation, the District filed suit against various current and former owners and operators of certain sites in the South Basin area that it believed were in some way responsible for groundwater contamination, including the following defendants at issue in this appeal: Accurate Circuit Engineering, Inc. (Accurate Circuit); Beatrice Companies, Inc. (Beatrice); Bell Industries, Inc. (Bell); BorgWarner Morse TEC LLC (BorgWarner); Brenntag Pacific, Inc. (Brenntag); Dyer Business Associates, LP (Dyer); DRSS-I, LLC (DRSS); Embee, Inc. (Embee); Emerson Electric Co. (Emerson); Gallade Chemical, Inc. (Gallade); GE Aviation Systems LLC (GE Aviation); General Electric

4

Company (GE); ICI Americas, Inc. (ICI); ITT Corporation (ITT); Marotta Controls, Inc. (Marotta); Ricoh Electronics, Inc. (Ricoh); SABIC Innovative Plastics US, LLC (SABIC); Sanmina Corporation (Sanmina); Soco West, Inc. (Soco West); Steelcase Inc. (Steelcase); UNISYS Corporation (UNISYS); and Universal Circuits, Inc. (UCI). The District sued a number of other parties that are not the subject of this appeal, either because they were dismissed at some point in the litigation or the District has not appealed the judgments in their favor.[1]

The District asserted statutory claims for damages under the Carpenter-Presley-Tanner Hazardous Substance Account Act (HSAA; Health & Saf. Code, § 25300 et seq.) and the Orange County Water District Act (OCWD Act; Stats. 1933, ch. 924, p. 2400; West's Ann. Wat. Append. (2010 ed.) ch. 40) and for declaratory relief (Code Civ. Proc., § 1060). The District also asserted common law claims for negligence, nuisance, and trespass. Following numerous motions for summary judgment and summary adjudication, and a limited bench trial on the District's ability to bring suit under the HSAA, the trial court entered judgments in favor of the defendants on all of the District's claims.

The District appeals. It challenges the judgments on numerous grounds. In this opinion, we confirm that the HSAA allows the District to bring suit under the circumstances here (Health & Saf. Code, § 25363, subd. (d)) and that the District may

---

1    Another party, RadioShack Corporation (RadioShack), was sued by the District and was part of this appeal until its appellate proceedings were stayed pending resolution of RadioShack's bankruptcy. (*Orange County Water Dist. v. RadioShack Corp.* (G048970, app. pending).)

recover certain remediation-related investigatory costs under the OCWD Act, section 8, subdivision (c). We will also address the HSAA's nonretroactivity provision (Health & Saf. Code, § 25366, subd. (a)) and conclude that its requirements were not satisfied here. We further conclude that the theory of continuous accrual applies to the District's negligence cause of action, such that no defendant except GE Aviation has shown the statute of limitations bars that claim.

As to the District's causes of action for trespass and nuisance, we conclude the District has raised a triable issue of fact regarding its potential groundwater rights in the South Basin. In doing so, we address the State of California's potential interests in groundwater (as allegedly delegated to the District), the District's regulatory powers over groundwater, and its rights based on its groundwater replenishment or recharge activities. We conclude the District's potential rights in groundwater are insufficient, on the current record in this case, to maintain a trespass cause of action. However, we determine that triable issues of fact preclude summary adjudication of the District's nuisance claim for all defendants except UCI. Finally, we conclude that most of defendants' site-specific arguments (primarily based on causation) do not entitle them to summary adjudication of any causes of action. The judgments will therefore be affirmed in part and reversed in part, as discussed in detail below.

The litigation underlying this appeal is separate from the litigation involving the District's remediation proposals for the "North Basin" area of Orange County, which we considered in two recently-filed opinions. (*Orange County Water Dist. v. MAG Aerospace Industries, Inc.* (2017) 12 Cal.App.5th 229 (*MAG*); *Orange County Water*

6

*Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252 (*Alcoa*).)  The North

Basin, as its name suggests, is geographically separate from the South Basin, and it is

contaminated by different plumes of hazardous substances.  As we will explain, however,

several legal issues decided in the North Basin appeals (*MAG* and *Alcoa*) are relevant to

our discussion of the issues in this appeal.  We will therefore reference the North Basin

appeals where appropriate.  Moreover, although a number of the legal issues overlap, the

procedural postures of the North Basin and South Basin appeals are quite different.  The

North Basin appeals involved judgments following a bench trial or motion for judgment

under Code of Civil Procedure section 631.8, while this South Basin appeal largely

involves judgments following orders granting summary judgment and summary

adjudication.  Our standards of review in the North Basin and South Basin appeals are

therefore quite different, and this difference explains in large part the divergence between

our disposition of the North Basin appeals and our disposition in this appeal.

FACTUAL AND PROCEDURAL BACKGROUND

*The District and Its Powers*

The District is a public entity established by the California Legislature and

empowered to manage, replenish, regulate, and protect groundwater supplies within its

boundaries.  (OCWD Act, §§ 1, 2.)  Despite its name, the District is not a county water

district under the County Water District Law (Wat. Code, § 30000 et seq.) or a state

water district under the California Water District Law (*id*., § 34000 et seq.).  Instead, it

operates under its own governing act, the Orange County Water District Act, with its own

set of powers and responsibilities.

7

Under the OCWD Act, the District has the power to "[t]ransport, reclaim, purify, treat, inject, extract, or otherwise manage and control water for the beneficial use of persons or property within the district and protect the quality of groundwater supplies within the district." (*Id.*, § 2, subd. (6)(j).) To advance the goals of maintaining and protecting groundwater, the District may construct waterworks, acquire water rights, purchase and import water, store water in underground basins or surface reservoirs, and regulate the storage and use of groundwater in the District. (*Id.*, § 2, subds. (5), (6)(b), (c), (d) & (f).) The District must consent to any storage of groundwater by any other person within its boundaries (*id.*, § 2.1, subd. (a)), and the OCWD Act requires water producers, under threat of criminal prosecution, to register and install a device to measure the amount of water extracted (*id.*, § 35). The District may assess fees on water producers, such as a "Basin Equity Assessment" to encourage responsible water extraction (*id.*, §§ 2, subd. (6)(m), 31.5) and a "Replenishment Assessment" based on the amount of water extracted (*id.*, §§ 23, 27, 29).[2]

The District has the power of eminent domain (OCWD Act, § 2, subd. (10)) and broad powers to bring appropriate legal actions to further its goals and effectuate its powers (*id.*, § 2, subd. (9)). As to the latter, the OCWD Act provides, "To carry out the purposes of this act, [the District shall have the power] to commence, maintain, intervene in, defend, and compromise . . . any and all actions and proceedings now or hereafter begun to prevent interference with water or water rights used or useful to lands within the

---

[2]  A water producer is a person who extracts groundwater, thereby "producing" water for domestic consumption or other use.

8

district, or diminution of the quantity or pollution or contamination of the water supply of the district, or to prevent unlawful exportation of water from the district, or to prevent any interference with the water or water rights used or useful in the district which may endanger or damage the inhabitants, lands, or use of water in the district. . . ." (*Id.*, § 2, subd. (9).) The District, however, is prohibited from intervening in disputes over water rights within the District that do not involve pollution, contamination, exporting water outside the District, or some threat thereof. (*Ibid.*)

The District also has the power to investigate and remediate pollution and contamination in the surface and groundwater within its boundaries. (OCWD Act, § 8, subds. (a), (b).) If the District undertakes such work, it may recover its reasonable costs from the persons who caused the pollution or contamination under certain circumstances. (*Id.*, § 8, subd. (c).)

To maintain an adequate level of groundwater in its territory and protect groundwater quality, the District acquires water from various sources at its own expense and discharges it from District facilities in Orange County. This process replenishes or "recharges" groundwater in the Orange County groundwater basin, of which the South Basin is a part. The groundwater basin includes a number of aquifers, which extend up to 2,000 feet underground.

Although the District does not have any recharge facilities near the South Basin, the District's recharge efforts raise the level of groundwater there. The groundwater level increases because the entire basin is hydrologically connected, and the pressure response

from the District's recharge activities in other parts of the Orange County groundwater basin is felt in the South Basin area.

The District's recharge activities effectively store water in the groundwater basin, but the District does not itself use or extract groundwater. Other entities, such as the IRWD, operate extraction wells and produce water for public drinking water supplies and for other uses.

*The South Basin, Groundwater Contamination, and the District's Response*

The South Basin lies along California State Route 55 near the former Tustin Marine Corps Air Station in southern Orange County. Defendants are current and former owners and operators of businesses at sites in the South Basin area. At least for purposes of this appeal, defendants appear to concede that hazardous substances were released at or near their sites at some point in the past few decades. Further details regarding the conditions at certain defendants' individual sites will be discussed below in connection with those defendants' site-specific summary judgment and summary adjudication motions. The District and other regulatory agencies were aware of hazardous substance releases at some or all of defendants' sites well before the commencement of this litigation, and certain sites were the subject of remediation activities under the supervision of other public authorities.

As noted, the IRWD operates drinking water extraction wells in the South Basin area. One such well, IRWD-3, began producing drinking water in 1997. A year later, two VOC's, PCE and TCE, were detected in water extracted by the well. Three years after that, perchlorate was also detected in IRWD-3.

10

In 2006, the District engaged a consultant, Todd Engineers, to prepare a work plan for further investigation of groundwater contamination in the South Basin. The objectives of the work plan included identifying its probable sources and delineating its extent. The District referred to the effort as the South Basin Groundwater Protection Project (SBGPP) and allocated approximately $77,000 to Todd Engineers' work.

A year later, Todd Engineers submitted a "Technical Memorandum and Work Plan" for the SBGPP. The memorandum noted that contaminants had been detected at IRWD-3 and described the SBGPP as an effort "[t]o assist the IRWD in the assessment of current and future threats of contamination" and "to identify the source or sources of contamination in IRWD-3." To produce the memorandum, Todd Engineers reviewed public agency files relating to 55 sites in the South Basin area "that had potentially impacted groundwater." Todd Engineers identified sites where onsite and offsite groundwater contamination had been documented and analyzed groundwater flows and subsurface geology to determine which sites had the highest risk of contributing to contamination in water supply wells in the South Basin.

Todd Engineers also reviewed groundwater quality data from 16 wells in the South Basin. In addition to IRWD-3, PCE and TCE were detected in five wells. One well, located near a contaminated site, detected PCE and TCE concentrations that far exceeded California maximum contaminant levels (MCL's), another well detected levels of PCE and TCE at or near MCL's, and three wells detected low or trace levels.

Todd Engineers concluded, "There is no shortage of candidate sites that could have caused observed impacts to IRWD-3 based on site-specific monitoring data. More

11

than 30 industrial sites have impacted shallow groundwater with PCE, TCE, and/or perchlorate at concentrations at least one order of magnitude higher than recorded in IRWD-3." Todd Engineers identified a number of possible pathways for contamination to have reached IRWD-3. It concluded that the actual pathway was unknown based on existing data, but that areas northeast of IRWD-3 represented the area of highest risk to water supply wells. Todd Engineers identified a number of key data gaps that prevented full understanding of the nature, extent, and sources of contamination in the South Basin area. It developed a work plan to address the data gaps. The work plan, as described by District staff, involved a first phase of six groundwater monitoring wells and a second phase of nine groundwater monitoring wells, as well as technical analysis of the results. The estimated cost for the work plan was $6.1 million.

The next year, in 2008, District staff completed their own technical memorandum and an alternate plan for investigating contamination in the South Basin. The District's first phase plan involved six monitoring wells and associated technical analysis. The proposed budget for this plan was $625,000. District staff indicated that a phase two investigation would also be required, at an estimated cost of $3 to $5 million, to fully characterize the groundwater contamination and design a remediation program. The District completed installation of the six monitoring wells in 2009.

The District's monitoring wells confirmed the presence of VOC and perchlorate contamination. The District authorized additional "cone penetration" testing at various locations in the South Basin, at a cost of approximately $216,000. The District continued its investigation, and it began to develop plans for an interim treatment system. By 2012,

it had engaged an environmental engineering firm to conduct a remedial investigation, feasibility study, and remedial action plan for the SBGPP as a whole. The budget for the firm's effort was approximately $819,000.

The District has estimated that the total cost for construction of a groundwater treatment system for the South Basin will be in the tens of millions of dollars. By the time of the underlying litigation, however, the District's had spent approximately $1.5 million on tasks related to the SBGPP. The District continued to develop the SBGPP, but the interim treatment system had not begun operation and the SBGPP itself had not been constructed. The District had not yet cleaned up any groundwater in the South Basin.

*The District's Allegations Against Defendants*

In 2008, the District filed this lawsuit against a number of named defendants and 400 fictitiously named defendants to address current and threatened groundwater contamination in the South Basin. Each defendant at issue in this appeal was either named in the District's initial complaint or substituted for a fictitiously named defendant later during litigation. In its First Amended Complaint (FAC), the District alleged that it had discovered VOC and perchlorate contamination in the South Basin area of Orange County. It determined that "prompt action" was required to address threatened and existing contamination in the South Basin and initiated the SBGPP.[3]

---

3    Later in the litigation, the District filed a Second Amended Complaint (SAC). The SAC added allegations regarding the corporate histories of Brenntag and BorgWarner but was otherwise substantively identical to the FAC.

13

The FAC alleged that each defendant owned or operated a business "within the relevant area" where hazardous wastes (i.e., VOC's or perchlorate) had been released or that the defendant was otherwise responsible for such a release. As to certain defendants, the FAC included details regarding groundwater contamination at a defendant's site and specific VOC's released by that defendant. The FAC alleged, "Defendants' historical, current, and ongoing releases and disposal of significant quantities of hazardous substances and wastes, at various sites and facilities within the relevant area, have caused the contamination alleged in this Complaint. VOC's and perchlorate in the soil and groundwater, at, under, and emanating from, the sites pose an imminent and substantial threat to public health, natural resources, and the environment."

To support the District's cause of action under the OCWD Act, the FAC alleged that defendants "have caused and are causing" the District to incur costs to investigate groundwater contamination and pollution and that defendants "have caused, are causing, and will cause" the District to incur costs to remediate such contamination and pollution. The District sought to recover these costs, as well as the costs of unspecified "increased expenses," attorney fees, and a declaration regarding defendants' liability for future costs. Similarly, in its HSAA cause of action, the FAC alleged that defendants' hazardous substances releases had caused the District to incur necessary response costs, which it sought to recover from defendants, along with a declaration as to future liability.

The District's negligence cause of action rested on allegations that defendants failed to exercise due care in the handling, use, and remediation of hazardous substances. Specifically, the FAC alleged that defendants negligently and recklessly failed to prevent

14

spills and other releases of hazardous substances, to monitor and discover such spills and releases, to warn those affected, and to clean up or remediate the hazardous substances. These negligent acts caused groundwater pollution and "[i]mpair[ed] the District's rights to maintain the quality of groundwater throughout the District." The FAC claimed investigation, remediation, and treatment costs, as well as other unspecified damages, as a result of these acts. In connection with this cause of action, the FAC alleged that certain defendants acted reprehensibly and with conscious disregard of known risks to health and property. The District sought punitive damages against those defendants.

The FAC also alleged causes of action for trespass and nuisance. As to trespass, the FAC alleged that the District "is the owner, actual possessor, and represents the interests of the owners and actual possessors of property rights and interests in the groundwater within its territory . . . ." The FAC alleged that defendants' release of hazardous substances, negligent remediation activities, and failure to warn constituted trespasses on the District's "property and interests" in the South Basin. The District claimed the same investigatory, remediation, and treatment costs described above, as well as punitive damages against certain defendants. As to nuisance, the FAC alleged that the defendants' contamination and pollution of groundwater constituted a nuisance, which "specially and adversely affected" the District and damaged the District's "property rights, water rights, and interests." In connection with this cause of action, the District claimed compensatory damages, punitive damages against certain defendants, and equitable relief requiring defendants to abate the nuisance.

15

The District's declaratory judgment cause of action alleged that "[a]n actual controversy exists concerning who is financially responsible for abating actual or threatened pollution or contamination of groundwater resources within the District by VOC's and perchlorate." The District sought "an adjudication of the respective rights and obligations of the parties," which it later specified as (in part) an order "declaring that defendants are liable for the full cost of all remedial and other actions necessary to abate and remove VOC's and perchlorate which are contaminating and threatening the district's property . . . ."

*Pretrial Proceedings*

In multiple and overlapping motions for summary judgment and summary adjudication, some (though not all) filed jointly, defendants challenged each of the District's causes of action. Certain defendants were completely successful and obtained judgment in their favor as a result of these summary proceedings. Other defendants obtained summary adjudication of all of the District's causes of action except its HSAA and declaratory relief claims. Although the individual motions brought by defendants differed somewhat in substance, the primary grounds are summarized below. Further detail will be provided in the next section.

As to the District's claim under the OCWD Act, defendants pointed out that the OCWD Act allows recovery only of remediation costs, i.e., "reasonable costs actually incurred in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action." (OCWD Act, § 8, subd. (c).) Defendants claimed that the District had not incurred any remediation costs in

16

connection with the SBGPP. Instead, the District's costs were merely "investigatory" and therefore not recoverable under the OCWD Act. Defendants asserted that the "District [had] no project or activity underway [that was] physically removing contamination from the aquifer in the South Basin." In opposition, the District acknowledged that it had not completed a final remediation plan for the South Basin or physically removed contamination from the aquifer in the South Basin. The District contended that its investigatory costs were encompassed within the scope of the OCWD Act's recoverable remediation costs. The District argued these costs were part of the District's overall effort to design, develop, and refine the SBGPP, an "iterative process" that would result in cleanup of contamination in the South Basin. The trial court agreed with defendants and granted the motion.

In a similar vein, certain defendants argued that the District could not pursue a claim under the HSAA because the District was not itself liable for any contamination in the South Basin and therefore could not seek "contribution or indemnity" as those terms are used in the HSAA. (Health & Saf. Code, § 25363, subd. (d).) In defendants' view, an HSAA "contribution" claim required a judgment against the District (see *Coca-Cola Bottling Co. v. Lucky Stores, Inc.* (1992) 11 Cal.App.4th 1372, 1378), and an HSAA "indemnity" claim required the District to share a common liability with defendants, i.e., traditional equitable indemnity (see *Jocer Enterprises, Inc. v. Price* (2010) 183 Cal.App.4th 559, 573 (*Jocer*)). The District disagreed, arguing that it could sue for "indemnity" because it was protecting its interests in groundwater in the South Basin. The trial court again agreed with defendants and granted several motions on that basis.

17

Defendants challenged the District's trespass claim on the grounds that it did not "exclusively possess" the affected groundwater and therefore could not bring such a claim. Defendants pointed out that the District did not own any land in the South Basin and did not extract any groundwater in the South Basin. Any rights held by the District to regulate or appropriate groundwater in the South Basin were insufficient, in defendants' view, to support a claim for trespass. The District opposed, arguing that its interest in groundwater was substantial and need not be exclusive to support a trespass claim. The trial court ruled in favor of defendants and granted defendants' motion for summary adjudication. It explained, "While the [OCWD] Act gives the District certain powers which may be translated into property interests in the groundwater, those interests are not exclusive possessory interests and do not constitute ownership. They therefore do not support a cause of action for trespass."

With respect to nuisance, defendants argued (among other things) that the District lacked sufficient property interests in the South Basin or its groundwater to maintain an action for private nuisance, that the District did not suffer a special injury sufficient to maintain an action for public nuisance, and that any groundwater contamination was not a "substantial and unreasonable" interference sufficient to support any claim for nuisance at all. The District pointed primarily to its recharge activities as evidence that it had an appropriative water right in groundwater in the South Basin, which was a sufficient property right to support both a public and private nuisance.

The trial court concluded that defendants had "met their burden of establishing that the District does not operate any groundwater production wells, does not extract or

pump groundwater, and[] its recharge operations would not be effective in the South Basin[.]" The court was not persuaded that the District had any property rights in the South Basin, including by reason of its recharge activities. The court explained, "the District has never contemplated using the groundwater nor ever actually used the groundwater, required elements for appropriation necessary to support nuisance." The court further found that the District had not suffered a special injury sufficient to support a private nuisance claim and that the presence of low levels of contaminants was not substantial and unreasonable harm. The court therefore granted defendants' motions for summary adjudication of the District's nuisance claim.

Defendants' common challenges to the District's negligence claim rested primarily on the statute of limitations. Defendants claimed that the District had actual or constructive knowledge of contamination at their sites at least as early as August 2003, and in some cases more than 15 years before then. Defendants argued that the District's knowledge triggered the three-year statute of limitations. (Code Civ. Proc., § 338, subd. (b); *Wilshire Westwood Assoc. v. Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 739-740.) In defendants' view, because the District did not file suit until June 2008, more than three years later, its negligence claim against defendants was time-barred. The District opposed defendants' motions primarily on the grounds that its knowledge of contamination at defendants' sites was insufficient to trigger the statute of limitations. In the District's view, the statute began to run only when the District became aware of insufficient remedial efforts or offsite harm. The trial court found in favor of the defendants. It determined that the District either had actual knowledge or was on inquiry

19

notice of a potential claim for groundwater contamination by defendants more than three years before the District filed its lawsuit.

In rejecting the District's contrary argument, the court reasoned, "Actual knowledge of the full extent of the damage to property is not required before a plaintiff is held to the standard of actual knowledge for purposes of commencing the statute of limitations. [Citation.] For this reason, the Court does not adopt the District['s] argument that there is no appreciable harm to the District's property interests until 'the District confirms that contamination has escaped remedial efforts overseen by state and local regulators and threatens or contaminates groundwater used as a drinking water resource.[']" The court granted defendants' motions for summary adjudication of the District's negligence claim.

A number of defendants challenged the District's claims, primarily under the HSAA, on the alternative grounds specific to their sites (e.g., causation). The evidence supporting these motions is varied and voluminous, and the legal theories advanced in the motions differ among the defendants, in some cases significantly. We will discuss these motions, and the District's responses, in detail below. It is sufficient to mention here that the trial court granted summary adjudication in favor of several defendants on site-specific grounds in addition to other, more general grounds.[4]

---

4       The trial court denied a site-specific summary adjudication motion filed by Steelcase. In this appeal, Steelcase contends the court's denial was error. (See Code Civ. Proc., § 906.) We will address Steelcase's contention below.

20

Through these motions, and in some cases additional motions for judgment on the pleadings challenging the District's claim for declaratory relief, Beatrice, Bell, BorgWarner, DRSS, Emerson, Gallade, GE, GE Aviation, ICI, Marotta, Ricoh, SABIC, Sanmina, UNISYS, and UCI obtained complete adjudication of the District's claims against them. The trial court entered judgments in their favor accordingly, and the District appealed.

*Bench Trial and Statement of Decision*

The remaining defendants at issue in this appeal obtained summary adjudication of all the District's claims except under the HSAA and for declaratory relief. The court held a trial on these remaining claims in June and July 2013. The initial phase of trial was limited to the District's standing or ability to bring suit under the HSAA. Following trial, which included witness testimony as well as documentary evidence, the court announced an oral tentative statement of decision finding that the District could not pursue a claim under the HSAA (Health & Saf. Code, § 25363, subd. (d)) or obtain related declaratory relief. The court noted, "Although this trial turned out not so much to be about standing, the time spent here has been very valuable in the court's opinion. This trial has afforded a certain freedom and stretching of the imagination not otherwise offered in summary adjudication hearings. The process involving, as it did, the introduction of evidence, has brought us full [circle] to a close analysis of the very statute that started the inquiry."

The court's written statement of decision comprehensively analyzed the language, history, and structure of the HSAA. The court believed that the phrase "contribution or indemnity" should be analyzed together as two various of the same concept, i.e., the

allocation of damages among multiple tortfeasors. "Indemnity" in the court's view meant traditional equitable indemnity, which requires that the parties be responsible for a joint legal obligation.[5]

Based on the evidence presented at trial, the court found that the District was not a responsible party under the HSAA and therefore could not maintain a claim for indemnity. A District employee testified that the District does not own any real property (including any overlying land) in the South Basin. Nor does the District pump or extract any groundwater in the South Basin. Another District employee referenced the District's diversion rights with respect to the Santa Ana River, but the point of diversion was miles away from the South Basin.

Given this conclusion, the court found that the District's claim for declaratory relief must fail. The court had previously determined that the District's declaratory relief claim was entirely dependent on its other claims. Having determined that the District's remaining claims had no merit (either by summary adjudication or at trial), the court found against the District on its declaratory relief claim as well.

The court entered judgment against the District and in favor of Accurate Circuit, Brenntag, Dyer, Embee, ITT, Soco West, and Steelcase. The District again appealed.

---

[5] Citing *Jocer, supra*, 183 Cal.App.4th at page 573, the court stated its view that only two forms of indemnity are recognized in California: express indemnity grounded in contract and traditional equitable indemnity. As we explain in part II.B. *post*, we disagree that indemnity in California is limited to these two forms.

22

DISCUSSION

I. *Standards of Review*

The District appeals judgments following motions for summary judgment and summary adjudication, motions for judgment on the pleadings, and a bench trial. The standards governing our review of summary judgment and summary adjudication proceedings are substantively identical. (See *California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 630.) Our review in either case is de novo. (*Id.* at p. 631; see *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249 (*Conroy*).)

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] The burden of persuasion remains with the party moving for summary judgment. [Citation.] When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*).) "The materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' " (*Conroy, supra*, 45 Cal.4th at p. 1250.) "If the defendant fails to meet this initial burden, it is unnecessary to examine the plaintiff's

23

opposing evidence; the motion must be denied." (*San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528, 1534 (*San Jose Const.*).)

"If the defendant 'carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' [Citation.] 'The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' " (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1497 (*Schmidt*).)

"[T]o determine whether there is a triable issue, we review the evidence submitted in connection with summary judgment, with the exception of evidence to which objections have been appropriately sustained." (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 (*Frittelli*).) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

Courts are split regarding the proper standard of review for the trial court's evidentiary rulings in connection with motions for summary judgment and summary adjudication. (Compare *Miranda v. Bomel Construction Co.* (2010) 187 Cal.App.4th

24

1326, 1335 [abuse of discretion] with *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1451 (*Pipitone*) [de novo].)  We need not address that split because, as we will explain, we need not reach any of the evidentiary disputes raised by the parties in their briefing. This circumstance is due, in part, to the District's failure to challenge certain evidentiary rulings in its appellant's brief.  In many cases, the District simply cited the excluded evidence without noting the court's ruling.  This was doubly improper:  It gave the misleading impression that the evidence had been admitted, and it waived any argument that that the court's evidentiary rulings were erroneous.

"Though summary judgment review is de novo, review is limited to issues adequately raised and supported in the appellant's brief."  (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.)  This principle applies equally to the trial court's evidentiary rulings.  (*Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114; *Frittelli, supra*, 202 Cal.App.4th at p. 41.)  Here, with few exceptions, because the District did not raise its challenges until its reply brief, we treat those challenges as waived.  (*Tilton v. Reclamation Dist. No. 800* (2006) 142 Cal.App.4th 848, 864, fn. 12 ["[T]he issue was waived as to this court because it was noted only in appellants' reply brief, and not in their opening brief."]; *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3.)[6]

---

6       The District points out that the reviewing court in *Pipitone* concluded that the appellant did not waive her evidentiary challenges by failing to raise them in her opening brief.  (*Pipitone, supra*, 244 Cal.App.4th at p. 1452 ["We . . . do not accept the argument that because [appellant] failed to expressly challenge the trial court's evidentiary rulings excluding portions of the declarations and the entirety of [her] expert report, we must

25

"We review the granting of a motion for judgment on the pleadings de novo to determine whether a cause of action has been stated, treating as true all properly pleaded material facts." (*Soco West, Inc. v. California Environmental Protection Agency* (2013) 213 Cal.App.4th 1511, 1514.) And, while we review the court's factual findings following a bench trial for substantial evidence, we are not bound by the trial court's determination of questions of law. "Under the general rules applicable to a trial court's statement of decision, an appellate court independently reviews questions of law and applies the substantial evidence standard to findings of fact." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.)

---

defer to those rulings without considering whether the trial court's exclusion of potentially material evidence was proper."].) In a footnote, the *Pipitone* court explained, "There is no question that [appellant's] opening brief on appeal should have denoted which evidence in her moving papers had been excluded based on objections sustained by the trial court. Even so, each respondent has had the opportunity to address his objections raised and sustained below, and we consider the issue of the evidentiary rulings to be properly before this court as part and parcel of the appeals from the summary judgments." (*Id.* at p. 1451, fn. 12.) The import of *Pipitone*'s holding is somewhat unclear. If *Pipitone* stands for the proposition that a reviewing court has the *authority*, in its discretion, to excuse an appellant's failure to raise a claim of error in her opening brief, provided that the respondent has an adequate opportunity to brief the issue, that proposition is uncontroversial. (See, e.g., *Jameson v. Desta* (2009) 179 Cal.App.4th 672, 674, fn. 1.) If, however, *Pipitone* is read to excuse an appellant generally from the requirement to raise errors in the trial court's evidentiary rulings or risk a finding of waiver, we respectfully disagree. Here, even though we have the authority to excuse the District's failure to raise issues in its opening brief, it has established no basis for us to exercise our discretion in that regard. (See *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1542 ["There is absolutely no sound reason [why] this issue could not have been raised in the [appellants'] opening brief."].)

26

## II. *HSAA*

### A. *Overview of Disputed Issues*

In their motions for summary adjudication and during the bench trial, defendants challenged the District's HSAA claim on several grounds. Defendants primarily argued the HSAA did not provide for a private action by the District in the absence of evidence that it was jointly liable with defendants for costs arising from contamination in the South Basin, i.e., the HSAA provided only for a private action for traditional equitable indemnity. We considered this issue in our recent *Alcoa* opinion and concluded that the District was able to bring suit for statutory indemnity under the HSAA even without proof it was jointly liable with the defendants. (See Health & Saf. Code, § 25363, subd. (d); *Alcoa, supra*, 12 Cal.App.5th at pp. 298-304.) For reasons we explain, we will adhere to that interpretation here.

Defendants also raised a number of specific arguments based on the facts and expert analyses of their sites and activities. These arguments, and the facts and analyses on which they are based, are complex and unique to each site, but they largely raise questions of causation and the identification of potentially responsible parties. We will discuss them in detail below. We conclude that none of the defendants were entitled to summary adjudication of the District's HSAA claim on these site-specific grounds. One defendant, Marotta, asserted a defense based on the HSAA's nonretroactivity provision. (See Health & Saf. Code, § 25366, subd. (a).) For reasons we will explain, we conclude Marotta did not establish the elements of this defense and was therefore not entitled to summary adjudication on this basis either.

27

B.  *The District's Ability to Bring Suit*

The District argues that the court erred in finding, on summary adjudication and following its bench trial, that the District could not bring suit for "contribution or indemnity" under the HSAA in the absence of evidence that the District itself was jointly liable for remediation costs stemming from groundwater contamination in the South Basin.  The HSAA reads in relevant part as follows:  "A person who has incurred response or corrective action costs in accordance with this chapter, Chapter 6.5 (commencing with Section 25100), or the federal act may seek contribution or indemnity from any person who is liable pursuant to this chapter."  (Health & Saf. Code, § 25363, subd. (d).)[7]

We comprehensively examined the scope of the HSAA's private right of action in our recent *Alcoa* opinion.  (*Alcoa, supra*, 12 Cal.App.5th at pp. 298-304.)  We concluded that the term "indemnity," as used Health and Safety Code section 25363, encompasses a plaintiff's cause of action for reimbursement of costs even where (as here) the plaintiff is not jointly liable for such costs.  We explained, "The HSAA's private right of action appears to be an instance of 'statutory indemnity,' which Black's Law Dictionary defines as '[i]ndemnity conferred by legislation' and cites as an example the common statutory obligation of corporations to indemni[f]y their personnel."  (*Id.* at p. 301.)  Other

---

[7]     The quoted language became effective on January 1, 2016.  (Stats. 2015, ch. 458, § 2.)  Prior to that date, among other changes, the beginning of the first sentence read, "Any person who has incurred removal or remedial action costs in accordance with this chapter . . . ."  (Former Health & Saf. Code, § 25363, subd. (e).)  These changes do not appear to affect the substance of this appeal, so we will refer to the current language in our discussion.

instances of statutory indemnity exist outside the HSAA.  (See, e.g., Lab. Code, § 2802; Civ. Code, §§ 1833, 3336; see also *Alcoa*, at pp. 301-302.)  We rejected the argument, advanced by defendants and adopted by the trial court here, that a private cause of action for indemnity under the HSAA is limited to plaintiffs who can establish the elements of traditional equitable indemnity.  (*Alcoa*, at pp. 300-301.)  Instead, the HSAA allows any plaintiff "who has incurred response or corrective action costs" to seek reimbursement of those costs from a liable person, provided it can establish the other elements of a claim. (Health & Saf. Code, § 25363, subd. (d); *Alcoa*, at pp. 300-301.)

Defendants' arguments to the contrary effectively mirror those which we considered and found unpersuasive in *Alcoa*.  We have assessed the arguments advanced in this appeal, including based on legislative history, and do not believe reconsideration of our conclusions in *Alcoa* is warranted.  We therefore conclude that the trial court erred by rejecting the District's HSAA claim on the basis that the District had no ability to sue because it had not demonstrated that it was liable for remediation costs caused by groundwater contamination in the South Basin.

C.  *HSAA Elements: Causation and Potentially Responsible Parties*

As noted, several defendants moved for summary adjudication of the District's cause of action under the HSAA on alternative grounds.  These defendants challenged the District's ability to prove the elements of its HSAA claim, specifically the elements of causation and potentially responsible parties.

The HSAA is California's counterpart to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA; 42 U.S.C.

29

§ 9601 et seq.). (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 865, fn. 4.) Although the HSAA and CERCLA are not identical, the HSAA adopts CERCLA's standards for determining liability. (Health & Saf. Code, § 25323.5, subd. (a)(1).) A private cause of action under the HSAA therefore has the same elements as a cause of action under CERCLA. (*Alcoa, supra*, 12 Cal.App.5th at p. 298; *Gregory Village Partners, L.P. v. Chevron U.S.A., Inc.* (N.D.Cal. 2011) 805 F.Supp.2d 888, 897.)

Under CERCLA and the HSAA, " '[t]o prevail in a private cost recovery action, a plaintiff must establish that (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of the term, Section 101(9), 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a) [42 U.S.C. § 9607(a)].' " (*Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 870-871 (*Carson Harbor*) [en banc].)

The third element, causation, focuses on whether a release or threatened release of hazardous substances from a site caused a plaintiff's necessary response costs.[8] The causation requirement is based on the *site* at issue. (*Alcoa, supra*, 12 Cal.App.5th at p.

_____

8    The requirement of consistency with the national contingency plan is not at issue in this appeal and will therefore be omitted from our discussion of this element. (Cf. *Alcoa, supra*, 12 Cal.App.5th at pp. 297-305.)

306 ["[A plaintiff] is only required to show a release or threatened release from a site and a causal connection between that release or threatened release and its response costs."].) For purposes of this element, the identity of the person who caused the release or threatened release is irrelevant. "It is clear from the text, structure, and legislative history of [42 U.S.C. § 9607] that the provision does not require a plaintiff to show that a particular defendant caused either the release or the incurrence of response costs in order to prove liability." (*Kalamazoo River Study Group v. Menasha Corp.* (6th Cir. 2000) 228 F.3d 648, 655 (*Kalamazoo River*); see *United States v. Alcan Aluminum Corp.* (3d Cir. 1992) 964 F.2d 252, 265 (*Alcan Aluminum*).)

A response cost is " 'necessary' " if "there is a threat to human health or the environment and . . . the response action is addressed to that threat." (*Carson Harbor, supra*, 270 F.3d at p. 872; see *Alcoa, supra*, 12 Cal.App.5th at pp. 327-328.) The necessity requirement may be met "if it is shown that *any* release violates, or any threatened release is likely to violate, *any* applicable state or federal standard, including the most stringent." (*Amoco Oil Co. v. Borden, Inc.* (5th Cir. 1989) 889 F.2d 664, 670-671; see *Alcoa*, at p. 328 ["The presence of VOC contamination at significant levels was a threat to human health and the environment."].) "Investigatory costs incurred 'in order to assist with and help plan the eventual remediation and cleanup efforts' are necessary under CERCLA [citation] and ' "are recoverable even absent any subsequent recoverable response costs" ' [citation]." (*Alcoa*, at pp. 327-328.)

The fourth element, potentially responsible parties, defines potential liable defendants by their relationship to the site at issue. "[T]he version [of CERCLA]

31

ultimately passed by Congress . . . imposed liability upon a *class* of responsible persons without regard to whether the person specifically caused or contributed to the release and the resultant response costs." (*Alcan Aluminum, supra*, 964 F.2d at p. 265.) "These categories are based on the defendant's relationship to the site, not the defendant's relationship to the release or threatened release that caused the incurrence of response costs." (*Alcoa, supra*, 12 Cal.App.5th at p. 306.) As relevant here, these categories include (1) the current "owner and operator" of the site at issue and (2) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." (42 U.S.C. § 9607(a)(1)-(2).)

"Disposal" in this context means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." (42 U.S.C. §§ 6903(3), 9601(29).) Because this definition includes actions that "may" lead to hazardous substances entering the environment, the hazardous substances need not actually reach the environment for an action to constitute a disposal. (*Voggenthaler v. Maryland Square LLC* (9th Cir. 2013) 724 F.3d 1050, 1064 (*Voggenthaler*).)

In their motions, several defendants challenged the District's ability to prove one or both of these elements. We will discuss each defendant or group of related defendants in turn. In summary, we conclude none of these defendants—BorgWarner and Emerson,

GE Aviation, Marotta, Ricoh, Sanmina, Steelcase, and UCI—has demonstrated entitlement to summary adjudication of the District's HSAA claim.

## 1. *BorgWarner and Emerson*

From 1955 to 1973, a predecessor of BorgWarner (according to the District's allegations) owned and operated a manufacturing plant at a site at 3300 South Standard Street in Santa Ana. It sold the site to Emerson in 1973. Emerson owned and operated the site until 1988 and continued to operate the site under lease until 1991. Emerson used the site for manufacturing electrical equipment.

When Emerson sold the site in 1988, preliminary environmental investigations led to concerns that "the historical use of halogenated [VOC's] may have resulted in the discharge of VOCs at the site." Further investigations revealed that "VOCs had significantly impacted soil and groundwater underlying the site," in decreasing concentrations down to at least 80 feet below the surface. Emerson developed a corrective action plan to remediate the site, which the Regional Water Quality Control Board (RWQCB) approved. The plan involved construction of a 1,190-foot bentonite slurry wall, over 2 feet thick, around the two primary sources of VOC contamination. The wall extended down to a clay aquitard, approximately 65 feet below the surface. Approximately 7.5 million gallons of groundwater and 40,600 tons of soil within the slurry wall were extracted, removed, and treated. Treated soil was then backfilled at the site.

Following these remediation efforts, significant contamination remained in groundwater. One groundwater monitoring well near the contamination sources detected

33

13,145 parts per billion (ppb) of total VOC's. Emerson proposed a further remediation work plan, consisting of a dual vacuum extracting and air sparging system with injection of hydrogen peroxide. The RWQCB approved the plan. The system operated for approximately six months, and it significantly reduced the concentration of VOC's in groundwater. By April 1998, the average concentration of total VOC's in groundwater monitoring wells at the site was 256 ppb. An offsite monitoring well detected only TCE, at a concentration of 2.2 ppb, a decrease from 13 ppb three years earlier.[9]

In March 1999, the RWQCB issued a "no further action" letter regarding the Emerson site. The RWQCB wrote, "Emerson has satisfactorily completed groundwater remediation at this site. Concentrations of VOCs in groundwater have been significantly reduced from over 100,000 ppb to an average of 256 ppb. The lateral and vertical extent of groundwater that has been impacted by VOCs is very limited, and is primarily confined to the area within the boundary of the slurry wall. Based on the mass and concentrations of VOCs that remain in the groundwater, the VOCs are not considered to be a threat to the beneficial uses of the Santa Ana Pressure Groundwater Subbasin. On the condition that the information provided to us was accurate and representative of existing groundwater conditions at the site, no further investigation or remediation of groundwater is required." The RWQCB concluded that "no further action at the site is necessary."

---

[9]     The applicable MCL's for the relevant VOC's in drinking water are 5 ppb for TCE and PCE, 6 ppb for 1,1-dichloroethylene (1,1-DCE), and 200 ppb for 1,1,1-trichloroethane (TCA). (See Cal. Code Regs., tit. 22, § 64444.)

The RWQCB employee responsible for reviewing the Emerson site testified at deposition that "the VOCs that were left in the soil and groundwater did not represent a threat to the beneficial uses of groundwater in the basin because [] the amount remaining was so much less than what was there originally and . . . what was left was situated in the perched groundwater zone above the clay layer which exists above the primary groundwater producing zone. [¶] And that with the concentrations and what limited mass was left at the site and the lack of transport of VOCs at the site historically, that what was left there was not going to migrate into the deeper groundwater and impact any existing or future groundwater production wells for drinking water."

A District expert, Anthony Brown, acknowledged he "could not conclude that it is more likely than not that releases of contaminants at the Emerson facility pose a threat to water supply wells." He believed it was reasonable for the RWQCB to conclude, based on the data available at the time, that the remaining VOC's at the Emerson site did not constitute a threat to beneficial uses of the groundwater basin. He also believed it was reasonable for the RWQCB to close its review of the site. Brown could not say whether additional onsite or offsite remediation would be required.

Based on these facts, BorgWarner and Emerson challenge the District's ability to prove that its response costs were "necessary" under the HSAA's third element, i.e., whether there is evidence that VOC releases from the Emerson site pose a threat to human health or the environment. (See *Carson Harbor, supra*, 270 F.3d at pp. 871-872; see also *Alcoa, supra*, 12 Cal.App.5th at pp. 327-328.) BorgWarner and Emerson argue there is no triable issue of fact regarding whether the releases are such a threat because

35

the RWQCB found that VOC's at the Emerson site were not a threat to beneficial uses of groundwater, and they further argue the District's expert did not rebut that conclusion.

This argument ignores the fact that VOC contamination remains in groundwater both at the Emerson site and offsite. At the Emerson site, the evidence shows that total groundwater VOC concentrations remained at 256 ppb *after* remediation. This concentration exceeds the applicable MCL's for the relevant VOC's in drinking water, as noted above: 5 ppb for TCE and PCE, 6 ppb for 1,1-DCE, and 200 ppb for TCA. (See Cal. Code Regs., tit. 22, § 64444.) A reasonable trier of fact could find that these concentrations posed a threat to human health or the environment, notwithstanding the RWQCB's conclusion that no further action was necessary at the site. (*Alcoa, supra*, 12 Cal.App.5th at p. 328; *Amoco Oil Co. v. Borden, Inc., supra*, 889 F.2d at p. 671; *United Alloys, Inc. v. Baker* (C.D.Cal. 2011) 797 F.Supp.2d 974, 996.) Similarly, while TCE concentrations offsite had decreased from 13 ppb to 2.2 ppb, because levels of offsite contamination exceeded applicable MCL's in the past and some offsite contamination remained, a reasonable trier of fact could conclude that offsite groundwater contamination posed a threat to human health or the environment as well.

BorgWarner and Emerson point out that hydrogeological conditions at the Emerson site make it unlikely that groundwater contamination would migrate to a depth sufficient to impact drinking water production wells. But drinking water production wells are not the only environmental resource worth protecting. The environment includes both shallow and deep aquifers, and significant VOC contamination even in

36

shallower groundwater could reasonably pose a sufficient threat to the environment justifying response costs.

Although the conclusions of the RWQCB and the admissions of the District's expert are persuasive evidence that further action at the Emerson site would be unnecessary, in light of the undisputed VOC contamination that remains at the site, we cannot say as a matter of law that this evidence would require a reasonable trier of fact to find that such contamination at the site does not pose a threat to human health or the environment. Defendants' evidence therefore does not "preclude a reasonable trier of fact from finding" in the District's favor on this element. (*Kahn, supra*, 31 Cal.4th at p. 1003.) Summary adjudication of the District's HSAA claim on this basis was therefore error. (See *San Jose Const., supra*, 155 Cal.App.4th at p. 1534.)

### 2. *GE Aviation*

GE Aviation or its predecessors have leased a site at 2036 and 2040 East Dyer Road in Santa Ana since 1999. GE Aviation is the current operator of the site. It manufactures aircraft parts and equipment and, as part of its operations, uses various solvents, including PCE. Although solvents were detected in groundwater at the site, GE Aviation denied any responsibility for groundwater contamination. Brown, the District's expert, testified that he would not be able to conclude it was more likely than not that any

37

hazardous substance releases at the site occurred after 1991, i.e., during the tenancy of

GE Aviation or its predecessors.[10]

Based on these facts, GE Aviation argues that it cannot be a potentially

responsible party under the fourth element of an HSAA and CERCLA claim.  It contends

that it can be liable under that element only if the District presents evidence that a

hazardous substance release or disposal occurred during its tenancy.  GE Aviation is

incorrect.  The current operator of a site is, under most circumstances, a potentially

responsible party under CERCLA and the HSAA.  (42 U.S.C. § 9607(a)(1).)  "[U]nder

CERCLA, an operator is simply someone who directs the workings of, manages, or

conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's

concern with environmental contamination, an operator must manage, direct, or conduct

operations specifically related to pollution, that is, operations having to do with the

leakage or disposal of hazardous waste, or decisions about compliance with

environmental regulations." (*United States v. Bestfoods* (1998) 524 U.S. 51, 66-67

(*Bestfoods*).)

An operator need not itself have caused contamination or pollution to be liable;

there is no exception to liability for "innocent" operators.  (*Litgo New Jersey Inc. v.

Commissioner New Jersey Dept. of Environmental Protection* (3d Cir. 2013) 725 F.3d

---

10     We note that GE Aviation's statement of facts in its separate respondent's brief is inadequate.  To support its factual assertions, GE Aviation provides citations only to its own memorandum of points and authorities in support of its motion for summary judgment in the trial court.  The Rules of Court require citation to the underlying evidence itself.  (See Cal. Rules of Court, rule 8.204(a)(1)(C); *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn. 4 (*Jackson*).)

369, 381 (*Litgo*).) "The statute does not require a showing that the operator was directly responsible for the release of a hazardous substance for [potentially responsible party] liability to attach. [Citations.] Indeed, in the case of a current operator, as opposed to a past operator, the plaintiff is not even required to show that the party was an operator when an active 'disposal' of hazardous waste occurred." (*Id.* at p. 381.) "In defining 'operator,' the Supreme Court employed broad, passive language: an operator is one who is involved in operations '*having to do with* the leakage or disposal of hazardous waste,' [citation], not one who is involved in operations 'causing' or 'leading to' the leakage or disposal of waste. Moreover, the Court expressly noted that operator liability may be imposed when a party is responsible for 'decisions about compliance with environmental regulations . . . .' " (*Id.* at p. 382.)

GE Aviation presented evidence that, at most, showed that a hazardous substance release had not occurred during its tenancy. It did not present evidence, for example, that it is not responsible for decisions about compliance with environmental regulations. GE Aviation therefore failed to meet its burden on summary judgment to show that the District could not establish this element of its HSAA claim, i.e., that it was not a potentially responsible party as a current operator. (See *Kahn, supra*, 31 Cal.4th at p. 1003.) It was error to grant summary adjudication on this basis. (See *San Jose Const., supra*, 155 Cal.App.4th at p. 1534.)

GE Aviation also argues that the District cannot establish causation. It claims it satisfied its burden on summary judgment by showing that it did not cause contamination (i.e., a hazardous substance release) at the site. GE Aviation misinterprets the causation

39

requirement under the HSAA. As noted above, the District need not show that *GE Aviation* caused a release at the site. Instead, the HSAA's causation element requires the District to show that a release at the site—from whatever source—caused the District's necessary response costs. As a current operator, GE Aviation is strictly liable for any such releases, regardless when they occurred. (See *Litgo, supra*, 725 F.3d at p. 381.) Because GE Aviation has not made an adequate evidentiary showing under the correct standard, it is not entitled to summary adjudication on this basis either.[11]

### 3. *Marotta*

Marotta owned a site at 2215 South Standard Avenue in Santa Ana from approximately 1954 until 1972. Its operations at the site included engineering, manufacturing, and testing pneumatic and hydraulic valve components. In its manufacturing processes, Marotta used TCE and PCE. TCE and PCE have been detected in soil and groundwater at the site.

A District employee testified at deposition that VOC contamination of soil and groundwater at the site occurred sometime before 1992. However, the District did not have any more specific information regarding when the VOC release or releases occurred

---

[11] At oral argument, GE Aviation argued it was entitled to summary adjudication because it had established a complete defense to the District's HSAA claim based on third party liability. (See Health & Saf. Code, § 25325.5, subd. (b); 42 U.S.C. § 9607(b)(3).) GE Aviation did not include this argument in its briefing. We therefore decline to consider it. (*Ace American Ins. Co. v. Walker* (2004) 121 Cal.App.4th 1017, 1027, fn. 2 (*Ace American*) ["We need not consider an argument not mentioned in the briefs and raised for the first time at oral argument."].)

or whether Marotta was the source.  Brown, the District's expert witness, could not say whether it was more likely than not that Marotta released contaminants at the site.

Marotta argues it was entitled to summary adjudication of the District's HSAA claim because it did not "release[]" chemicals at the site.  Although Marotta advanced this argument in the trial court, the court did not reach this argument because it ruled in Marotta's favor on a retroactivity defense.  (We will discuss this retroactivity defense in part II.D., *post.*)  We will consider Marotta's argument, however, as a potential alternative ground on which to affirm.  (See *Schmidt, supra*, 223 Cal.App.4th at p. 1498.)

Marotta's argument does not contain any legal analysis of the standards for liability under the HSAA or any citation to legal authority on that issue.  As such, it is unpersuasive.  And, in any event, Marotta's liability under the HSAA does not depend on whether the District can prove Marotta caused a "release" of hazardous substances at its site.  Its liability as a former owner requires a showing only that it "disposed of" hazardous substances there.  (42 U.S.C. § 9607(a)(2); *Voggenthaler, supra*, 724 F.3d at p. 1064.)  Because Marotta's evidence does not show that the District cannot prevail on this element, the trial court properly denied summary adjudication of the District's HSAA claim on this basis.  (See *Kahn, supra*, 31 Cal.4th at p. 1003; *San Jose Const., supra*, 155 Cal.App.4th at p. 1534.)

### 4. *Ricoh*

Ricoh manufactures various electronic components at several sites in Orange County.  From 1978 through 1988, its manufacturing process for one such component, copy machine drums, involved the use of PCE.  Testing in 1996 revealed PCE

41

contamination in soil and shallow groundwater at two Ricoh sites. Ricoh embarked on a multistage remediation effort approved by the RWQCB. The effort included a groundwater treatment and extraction system, a dual-phase extraction system, and chemical injections.

Ricoh moved for summary adjudication of the District's HSAA claim on the District's ability to bring suit as well as site-specific grounds. The trial court agreed, consistent with its prior rulings, that the District could not bring a claim for contribution or indemnity under the statute. Under the heading "Site-Specific Claim(s)," the court determined that Ricoh's efforts to remediate onsite contamination had been effective but that offsite contamination may remain. The court concluded that Ricoh's evidence regarding *onsite* contamination "would likewise support summary adjudication on this independent basis," but the same could not be said of *offsite* contamination. As to offsite contamination, the court explained, "the [c]ourt declines to find that Ricoh has met its evidentiary burden in this area and so[] does not base the aforementioned granting of summary adjudication on this evidence."

In its opening brief, the District asserted that Ricoh did not obtain summary adjudication on "causation-related" grounds. Ricoh disputes this assertion, claiming in its separate respondent's brief that the court's summary judgment ruling was "based on Ricoh's site-specific evidence in granting summary judgment on all causes of action." Later in the same brief, Ricoh repeats this claim: "As noted at the outset, the trial court granted Ricoh's motion for summary judgment on alternative grounds — the grounds

42

applicable to all Group One Defendants and the site-specific grounds applicable only to Ricoh."

Ricoh's claims are so broad as to be misleading. Ricoh does not distinguish among its causes of action, and it does not discuss the trial court's mixed ruling on the District's HSAA claim specifically. Nor does Ricoh explain how the court's conclusion, that triable issues of fact remained on the District's HSAA claim, could be interpreted as an alternate ground on which the court based summary judgment. A motion for summary adjudication may not be granted if it resolves only part of a cause of action (Code Civ. Proc., § 437c, subd. (f)(1)), absent stipulation by the parties and compliance with other procedural requirements (*id.*, § 437c, subd. (t)).

Ricoh argues that the District's failure to address site-specific grounds for summary judgment in its opening brief forfeits any claim of error on appeal. (See *Christoff v. Union Pacific Railroad Co., supra*, 134 Cal.App.4th at pp. 125-126.) But, as we have discussed, the trial court did *not* grant summary adjudication of the District's HSAA claim on grounds specific to Ricoh's site. Instead, it found that triable issues of fact remained as to offsite contamination. Because the trial court did not adopt any site-specific grounds for summary adjudication, the District was not required to address them in its opening brief. No forfeiture occurred.[12]

---

[12] An appellant is required to raise and support claims of error in its opening brief or they will be forfeited. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.) But the trial court's failure to adopt grounds for summary judgment or summary adjudication urged by the respondent does not constitute an error from an appellant's point of view. The appellant therefore need not address them in its opening brief (though it may do so).

43

Ricoh further argues, in cursory fashion, "Alternatively, Ricoh's judgment should be affirmed based on the merits of its site-specific showing. As the trial court found, the elements of causation and damages are negated for every cause of action because undisputed evidence established that there is no threat to drinking water due to any alleged Ricoh contamination." Ricoh again misstates the trial court's findings. For the HSAA cause of action, the trial court did *not* find that the elements of causation and damages were "negated." Moreover, Ricoh does not discuss the merits of the District's causes of action at all. Instead, it again asserts that the District forfeited any claim of error because it did not discuss grounds for summary adjudication specific to Ricoh's site. Ricoh's argument is unpersuasive for the reasons we have already discussed.

Ricoh offers no other argument why its motion for summary adjudication should have been granted on site-specific grounds. Ricoh has therefore not shown it is entitled to summary adjudication on this basis.

## 5. *Sanmina*

Sanmina (or its predecessor) owned a site at 2215 South Standard Avenue in Santa Ana from 1987 until 1998. Sanmina manufactured circuit boards there. Sanmina's manufacturing process involved the use of the VOC solvent 1,1,1-TCA. Sanmina applied for a permit from the South Coast Air Quality Management District for a cold degreaser

---

Indeed, "[i]n an appeal from a summary judgment . . . we are statutorily prohibited from affirming the judgment on a ground not relied on by the trial court unless we first afford the parties an opportunity for supplemental briefing on the issue." (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2011) 198 Cal.App.4th 1366, 1377, fn. 7, citing Code Civ. Proc., § 437c, subd. (m)(2).) This statute would make little sense if an appellant were required to address those grounds in its opening brief.

that would use one 55-gallon drum of 1,1,1-TCA per month. Degreasers are a common source of VOC contamination.

VOC releases occurred at the site. Testing at the site revealed 1,1,1-TCA contamination in soil and wastewater ground samples. 1,1-DCE was detected at the site as well. 1,1,1-TCA can break down into 1,1-DCE.

Sanmina's expert had no knowledge as to whether Marotta, a prior owner of the site, used 1,1,1-TCA in its operations. He did not believe that 1,1,1-TCA contamination had migrated from upgradient sources. He "presume[d]" that Standard Logic, another prior owner, used 1,1,1-TCA. But he did not know whether the 1,1,1-TCA found in soil at the site came from Standard Logic or Sanmina.

District witnesses admitted they had no information regarding when VOC releases occurred and no information whether Sanmina itself released VOC's into the soil. Sanmina's expert agreed there was no evidence that Sanmina released 1,1,1-TCA or other VOC's at the site.

Sanmina argues, here as in the trial court, that the District could not prove it was a potentially responsible party under the fourth element of an HSAA and CERCLA claim. Because Sanmina is a former owner and operator of the site, the fourth element is satisfied if it "disposed of" hazardous materials there. (42 U.S.C. § 9607(a)(2).) Evidence of a "release" is not required. (See *Voggenthaler, supra*, 724 F.3d at p. 1064.)

As noted, "disposal" includes the spilling, leaking, or placing any hazardous waste "into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged

45

into any waters, including ground waters."  (42 U.S.C. §§ 6903(3), 9601(29).)  The hazardous substances need not actually reach the environment for an action to constitute a disposal.  (*Voggenthaler, supra*, 724 F.3d at p. 1064.)  "[U]nder subsection (a)(2), any owner or operator is liable if he was an owner or operator at the time when hazardous waste was *either* placed on the site *or* leaked into the environment from a source on the site, whether or not such owner or operator was the cause of the disposal or, indeed, even had knowledge of it."  (*Crofton Ventures L.P. v. G&H Partnership* (4th Cir. 2001) 258 F.3d 292, 297.)

Viewing the evidence in the light most favorable to the District, we conclude there is a triable issue of fact regarding whether Sanmina (or someone at the site during Sanmina's ownership or occupancy) disposed of hazardous substances at the site.  The evidence showed that Sanmina used a VOC solvent, 1,1,1-TCA, in its manufacturing process and that the same solvent was found in the environment at the site.  A trier of fact could reasonably infer that Sanmina used substantial quantities of 1,1,1-TCA in at least one degreaser at the site.  Based on expert testimony that degreasers are common sources of contamination, as well as the fact that 1,1,1-TCA contamination actually occurred at the site, a trier of fact could reasonably conclude that Sanmina (or some other party) disposed of 1,1,1-TCA during Sanmina's occupancy of the site.  Based on the current

46

record, a triable issue of fact exists as to this element, and summary adjudication should not have been granted. (See *Aguilar, supra*, 25 Cal.4th at p. 850.)[13]

In its order granting summary adjudication, the trial court focused on whether the District raised a triable issue of material fact regarding a *release* of a hazardous substance into soil or groundwater. Similarly, in its respondent's brief, Sanmina uses the terms "disposal" and "release" interchangeably. Sanmina asserts, "[A]s the trial court correctly noted, evidence of use does not equate to evidence of a *release*." (Italics added.) The issue of whether Sanmina released a hazardous substance is irrelevant, for reasons we have already discussed. The dispositive question here is whether there is a triable issue of fact regarding whether Sanmina disposed of a hazardous substance. Sanmina does not effectively address the reasonable inferences that flow from the evidence considered by the trial court and how they might support the finding that hazardous substances were disposed of during Sanmina's occupancy. As such, Sanmina's arguments are unpersuasive. The court erred in granting summary adjudication in favor of Sanmina on the District's HSAA claim.

### 6. *Steelcase*

Steelcase operated a furniture manufacturing facility at 1123 Warner Avenue in Tustin, California from the early 1970's until 2003. In the trial court and in this appeal,

---

13    Given our conclusion, we need not address the parties' dispute over the relevance and significance of a wastewater discharge permit allowing Sanmina to dispose of VOC solvents into the Orange County sewer system. We also need not address the District's argument that the trial court erred by excluding wastewater sampling data showing the presence of VOC's in the discharged water.

Steelcase focuses on the following allegedly undisputed material facts: (1) the District does not use water in the shallow aquifer; (2) drinking water wells are screened at depths significantly below the shallow aquifer; (3) contaminants from the Steelcase site had not reached or threatened to reach any drinking water well; and (4) contaminants from the Steelcase site had not reached or threatened to reach a depth from which drinking water is obtained.

Relying on these facts, Steelcase contends the District cannot establish causation under the HSAA. Although the trial court denied Steelcase's motion for summary adjudication on this ground, Steelcase reasserts its arguments on appeal as an alternate ground on which to affirm the judgment in its favor. (See Code Civ. Proc., § 906.) We are unpersuaded.[14]

We note initially that Steelcase has waived its arguments on appeal. " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' argument for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*); see *Schmidt, supra*, 223 Cal.App.4th at p. 1509.) Steelcase's separate respondent's brief does

---

14 As we have noted, Steelcase later prevailed on this claim following a bench trial in which the court found the District could not bring suit under the HSAA. Because we have concluded the court's interpretation of the statute in this manner was erroneous (see part II.B., *ante*), we will consider Steelcase's causation argument.

not cite the HSAA, its liability provisions, its elements, or any authority interpreting it. Steelcase simply references "causation" generically, as if no further explanation were needed. This treatment is inadequate.

Even if Steelcase had not waived its arguments, we would find them unpersuasive. Under the HSAA, a plaintiff may recover "response or corrective action costs" in an indemnity action against a liable person. (Health & Saf. Code, § 25363, subd. (d).) To recover its costs from Steelcase, the District must establish a causal connection between a release or threatened release at Steelcase's site and the District's recoverable costs. (*Alcoa, supra*, 12 Cal.App.5th at p. 306 ; *Carson Harbor, supra*, 270 F.3d at p. 870.) Steelcase argues that the District cannot establish causation because a release of contamination from the Steelcase site has not reached or threatened to reach any drinking water well or aquifer at a depth where drinking water is obtained. Steelcase's argument fails because it does not establish, as a matter of fact or law, that the District's recoverable costs are so limited. For example, the District could potentially pursue recoverable costs related to groundwater in the shallow aquifer, which is an environmental resource worth protecting. Given the gap in Steelcase's logic, its evidence does not "preclude a reasonable trier of fact from finding" in the District's favor on the element of HSAA causation. (*Kahn, supra*, 31 Cal.4th at p. 1003.) Even assuming Steelcase had not waived its argument, it has not shown it was entitled to summary adjudication of the District's HSAA claim on this record. (See *San Jose Const., supra*, 155 Cal.App.4th at p. 1534.)

49

## 7. *UCI*

From 1981 through 1990, UCI manufactured printed circuit boards at a facility located at 1800 Newport Circle in Santa Ana, California. UCI used 1,1,1-TCA as a solvent for screen cleaning and tape residue removal. UCI obtained a permit to store 1,1,1-TCA in a 1,000-gallon aboveground tank. In 1988, UCI reported using approximately 3,900 gallons of 1,1,1-TCA per year. UCI phased out its use of 1,1,1-TCA in favor of other chemicals (including methyl ethyl ketone or MEK) from 1987 to 1990.

In 1979, prior to UCI's occupancy, a fire at the site caused a rupture in a 1,100-gallon aboveground storage tank containing 1,1,1-TCA. This rupture caused a release of 1,1,1-TCA at the site.

Groundwater at the site is contaminated with 1,1-DCE and 1,4-dioxane. 1,1,1-TCA breaks down into 1,1-DCE over time, and 1,4-dioxane was used to stabilize 1,1,1-TCA. The presence of 1,1-DCE and 1,4-dioxane in groundwater indicates that 1,1,1-TCA has been released at the site.

A UCI expert witness, Jeffrey Dagdigian, Ph.D, opined that the 1979 fire was "the cause of release of VOCs located in the subsurface." Dagdigian observed that groundwater testing in 1993 did not detect any 1,1,1-TCA, i.e., it had broken down completely into 1,1-DCE and other constituents. Based on 1,1,1-TCA's half-life of 1.7 years, the release that caused groundwater contamination at the site could not have occurred after 1979. Otherwise, 1,1,1-TCA would have remained detectable in groundwater. Dagdigian estimated the mass of the historic 1,1,1-TCA release at 576

50

pounds or 73 gallons. He believed it was reasonable to conclude that the 1979 fire led to the release of all 73 gallons of 1,1,1-TCA, after accounting for 1,1,1-TCA that dissipated into the air or was captured by the site's sump and clarifier. Dagdigian also noted that MEK had not been detected in groundwater. If UCI's procedures resulted in routine releases of solvents, he would have expected MEK contamination in groundwater as well. For their part, District witnesses could not identify any other VOC releases at the site other than the 1979 fire.

In opposition to UCI's motion, the District submitted deposition testimony from a former employee, Edward Stoll, that "some" drippage of 1,1,1-TCA solvent occurred during the tape residue removal process. The drippage was rinsed "into the floor." A UCI expert witness agreed that there is some minor spillage during printed circuit board manufacturing. The boards from which tape was removed were rinsed with water. The water carried a small amount of solvent to UCI's clarifier. From the clarifier, waste was discharged into the public sewer. Another former employee, Jerry Paulk, testified that the only pretreatment system in the clarifier was a pH adjustment. The District points to a 1984 spill that occurred at the clarifier at the site, though the extent of the spill and the chemicals involved is not part of the evidence. The District also provided evidence of several violations of hazardous substance handling regulations issued to UCI, but none referenced 1,1,1-TCA. Other evidence offered by the District, including an expert declaration, was excluded by the trial court.

UCI argues that the court's order summarily adjudicating the District's HSAA claim should be affirmed because the District cannot establish a causal nexus between

51

UCI's activities and groundwater contamination. But, as noted, the HSAA does not require proof of a causal connection between UCI's activities and groundwater contamination or the District's response costs. (*Alcoa, supra*, 12 Cal.App.5th at p. 306; *Kalamazoo River, supra*, 228 F.3d at p. 655; *Alcan Aluminum, supra*, 964 F.2d at p. 265.) The absence of such a connection therefore does not foreclose the District's HSAA claim against UCI.[15]

UCI's contrary arguments are unpersuasive. We comprehensively examined the requirement of causation under the HSAA in our recent *Alcoa* opinion. (*Alcoa, supra*, 12 Cal.App.5th at pp. 305-311.) We need not repeat that analysis here, but we will briefly comment on certain authorities cited by UCI. In *Boeing Co. v. Cascade Corp.* (9th Cir. 2000) 207 F.3d 1177, 1185 (*Boeing*), the federal appellate court was confronted with a situation it described as "causal overdetermination," i.e., where two defendants' actions were each sufficient to bring about the harm. *Boeing* concluded that under CERCLA both defendants in such a situation would be held to have caused the harm: "We therefore conclude that in the special case of causal overdetermination, i.e., where either polluter's conduct would have caused the same response cost to be incurred in the same amount, and the conduct was of substantially equal blameworthiness, the proper

---

[15] UCI claims the District may not advance this interpretation of the HSAA's causation requirement in this appeal because it did not make this argument in the trial court. But this appeal, and the District's arguments, raise pure questions of law and this matter has yet to be tried. To the extent the District forfeited its arguments by not advancing them in the trial court, we exercise our discretion to consider them. (See *Francies v. Kapla* (2005) 127 Cal.App.4th 1381, 1386.)

construction of the causation requirement in the statute is that both polluters should be treated as having caused the response cost." (*Ibid.*)

In discussing CERCLA generally, *Boeing* remarked, "CERCLA provides that a party that releases a hazardous substance is liable for another's response costs, but only if its release caused the other party to incur those response costs . . . ." (*Boeing, supra*, 207 F.3d at p. 1182.) UCI's reliance on this comment is misplaced. It was made in passing, without analysis, and was immediately followed by a quotation from CERCLA's liability provisions governing *current* owners and operators. (*Ibid*.) And, because *Boeing* considered only the special situation of causal overdetermination, it had no occasion to consider whether and under what circumstances former operators who had only disposed of hazardous materials could be liable. By contrast, "virtually every court that has considered this question has held that a CERCLA plaintiff need not establish a direct causal connection between the defendant's hazardous substances and the release or the plaintiff's incurrence of response costs." (*Alcan Aluminum, supra*, 964 F.2d at p. 265.)

*Carson Harbor*, likewise cited by UCI, also does not bear on this issue. It merely held that the terms "disposal" and "release" are not mutually exclusive, given their overlapping definitions. (*Carson Harbor, supra*, 270 F.3d at pp. 881-882.) The fact that two terms are not mutually exclusive does not mean that no distinction can be made between them. UCI also cites *Kalamazoo River Study Group v. Rockwell Internat. Corp.* (6th Cir. 1999) 171 F.3d 1065, 1068, which stated that "the plaintiff must establish a causal connection between the *defendant's* release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." (Italics added.) The federal

53

appellate court did not undertake any analysis of the issue, so it is unpersuasive. And, in any event, the same court considered and expressly rejected the position advanced by UCI the next year. (*Kalamazoo River, supra*, 228 F.3d at p. 655.)

Taking a different tack, UCI points to the requirement that a person must have "operated" the facility at issue in order to be liable. (42 U.S.C. § 9607(a)(2).) UCI claims that a former operator can only be liable if it had the authority to control the cause of the contamination at the time of a hazardous substance release, not merely a disposal. In UCI's view, this requirement indirectly forces a plaintiff to show that a former operator was responsible for a release which caused response costs. We disagree. As noted, the United States Supreme Court has defined the operator of a facility broadly, without regard to responsibility for a release: "So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." (*Bestfoods, supra*, 524 U.S. at pp. 66-67.) The definition is not limited to operators who actually caused pollution. (See *Litgo, supra*, 725 F.3d at p. 382; *K.C.1986 L.P. v. Reade Manufacturing* (8th Cir. 2007) 472 F.3d 1009, 1020.) UCI's reliance on apparently contrary statements in *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.* (9th Cir. 1992) 976 F.2d 1338, 1341 is unpersuasive because that opinion was decided before the United States Supreme Court's discussion of operator liability in

54

*Bestfoods* and because it appears to indirectly reimpose the traditional defendant-based causation requirement that numerous authorities have rejected. (See, e.g., *Kalamazoo River, supra*, 228 F.3d at p. 655; *Alcan Aluminum, supra*, 964 F.2d at p. 265; *Alcoa, supra*, 12 Cal.App.5th at pp. 306-307.) UCI does not attempt to show its activities at the site do not meet the *Bestfoods* definition of an operator. Its argument is therefore unpersuasive.

UCI emphasizes the perceived injustice of holding it liable for contamination released prior to its occupancy of the site. Such objections are matters of public policy that must be addressed to the Legislature. We note, however, that the HSAA contains several affirmative defenses and other limitations on liability (e.g., apportionment) that may apply here. (Health & Saf. Code, §§ 25323.5, subd. (b), 25363, subd. (a); *Alcoa, supra*, 12 Cal.App.5th at pp. 307, 310, fn. 28.) UCI has not raised these affirmative defenses or limitations on liability, and we express no opinion on their applicability.

The question in this appeal is therefore whether UCI showed there was no triable issue of fact regarding whether a person "disposed of" hazardous substances during UCI's operation of the site. (42 U.S.C. § 9607(a)(2).) Our review of the allegedly undisputed material facts identified in UCI's motion shows that these facts do not bear on the question of a "disposal" under the HSAA. Instead, they focus on the possibility of a "release" by UCI and whether UCI caused any groundwater contamination at the site. But, as we have explained, neither CERCLA's causation requirement nor its definition of "operator" require the District to show that UCI caused a release. It merely requires a disposal. (See *Voggenthaler, supra*, 724 F.3d at p. 1064.) On appeal, UCI does not

argue that it did not dispose of hazardous substances.  Because the facts offered by UCI, if credited, would not "preclude a reasonable trier of fact from finding" that UCI is a potentially responsible party under the HSAA, UCI was not entitled to summary adjudication of this claim.  (*Kahn, supra*, 31 Cal.4th at p. 1003; *San Jose Const., supra*, 155 Cal.App.4th at p. 1534.)[16]

### D.  *Nonretroactivity: Marotta*

The District contends the trial court erred by summarily adjudicating its HSAA claim against Marotta on the ground that Marotta was not liable under the HSAA's nonretroactivity provision.  That provision states, "This chapter shall not be construed as imposing any new liability associated with acts that occurred on or before January 1, 1982, if the acts were not in violation of existing state or federal laws at the time they occurred."  (Health & Saf. Code, § 25366, subd. (a).)

---

[16]    Even if UCI had met its initial burden, the District's evidence showing that 1,1,1-TCA was retained in the clarifier and discharged into the public sewer (along with expert testimony stating that minor spillage occurs during printed circuit board manufacturing) would be sufficient to raise a triable issue of material fact regarding disposal under the HSAA.  This evidence does not implicate the Stoll and Paulk deposition transcripts, which UCI contends are inadmissible hearsay.  We therefore need not address UCI's contention regarding admissibility.  (Compare *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142, 149 [testimony admissible] with *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1150 [testimony not admissible] and *Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688, 692 [same].)  A related issue is currently pending in the Supreme Court.  (See *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2016) 245 Cal.App.4th 19, review granted June 8, 2016, S233526 [Issues presented:  "(1) Is testimony given in a criminal case by persons who are not parties in a subsequent civil action admissible in that action to oppose a special motion to strike?  (2) Is such testimony subject to the conditions in Evidence Code section 1290 et seq. for receiving former testimony in evidence?"].)

56

Marotta sold the site at issue in 1972. In its motion for summary adjudication, Marotta relied on discovery responses from the District stating that the District was "unaware of any Cleanup and Abatement Order or other charge or citation issued to Marotta concerning the site." Marotta argued this evidence showed that the District could not establish that Marotta's activities at the site violated then-existing state or federal laws. In opposition, the District submitted evidence that Marotta used TCE and PCE in its manufacturing processes, that TCE and PCE contamination has been detected in soil and groundwater at the site, and the contamination occurred sometime before 1992.[17]

The parties agree that Health and Safety Code section 25366, subdivision (a) establishes an affirmative defense to liability under the HSAA. Marotta would bear the

_____

[17]    The District argues it submitted evidence that the degreasing equipment used by Marotta was a typical source of contamination. In its brief, the District cites only its separate statement of disputed material facts, rather than the underlying evidence itself. This is improper. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Jackson, supra*, 60 Cal.App.4th at p. 178, fn. 4.) The District also contends Marotta admitted certain facts, citing Marotta's filing in connection with a *different* summary adjudication motion. Such citation is improper and misleading. As far as we can discern, however, the District appears to be relying on California Code of Regulations, title 22, section 64481, which establishes disclosure requirements for drinking water consumer confidence reports. One of the disclosure requirements concerns the likely sources of contaminants in drinking water. (Cal. Code Regs., tit. 22, § 64481, subd. (d)(2)(I).) If contaminants are detected, and the likely source is not otherwise known, the report should identify the "typical" source identified in the regulations. (*Ibid.*) For TCE and PCE, the typical sources identified are degreasing activities. (*Id.*, § 64481, app. 64481-A.) While degreasing activities may be typical sources when contamination occurs, we disagree with the District's conclusion that this regulation implies that degreasing activities commonly lead to contamination. We also disagree that evidence of contamination caused by other parties' degreasers, without more, would support a reasonable inference that Marotta's degreaser caused contamination as well.

burden of proof at trial on this defense.  (See *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794-795; *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 469.)  In its motion for summary adjudication, Marotta had the initial burden of showing that the undisputed facts support each element of the defense.  (*Dailey v. City of San Diego* (2013) 223 Cal.App.4th 237, 249.)  It "must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not— otherwise, [it] would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact."  (*Aguilar, supra*, 25 Cal.4th at p. 851.)  If a defendant fails to meet this initial burden, its motion should be denied regardless of the plaintiff's evidentiary showing in opposition.  (*Id.* at p. 850; see *San Jose Const., supra*, 155 Cal.App.4th at p. 1534; see also *Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 169-170 (*Teselle*).)

Marotta and the District dispute the elements of the HSAA's nonretroactivity defense.  Marotta argues it satisfied its initial burden by showing that its ownership of the property (and therefore any conduct that would violate the HSAA) ceased prior to 1982. The District argues Marotta was also required to show that its conduct did not violate any then-existing state and federal laws.  We agree with the District.

The HSAA's nonretroactivity provision states that a defendant will not be liable under the HSAA if (1) the alleged wrongful acts occurred before on or before January 1, 1982 and (2) the alleged wrongful acts did not violate any existing state or federal laws at the time they occurred.  (Health & Saf. Code, § 25366, subd. (a).)  Unless both conditions are satisfied, the defense cannot overcome a prima facie showing of HSAA liability.

Given the text of the statute, and the broadly remedial nature of the HSAA, it is appropriate to place the burden on the otherwise-liable defendant to prove compliance with then-existing environmental laws, e.g., through compliance records or the testimony of knowledgeable individuals. Marotta is required to establish both elements to prevail on this affirmative defense.

We conclude Marotta did not meet its initial burden on summary judgment to establish that its alleged wrongful acts did not violate any existing state or federal laws. As noted, Marotta's evidence on this element consisted solely of District admissions in discovery that it had no evidence of any charges or citations for violations of environmental laws. But a defendant's motion for summary adjudication based on an affirmative defense may not be based on plaintiff's lack of evidence disproving the applicability of the defense. (*Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th at p. 473.) Instead, the defendant must offer evidence that, if credited, would require a reasonable trier of fact to find in its favor on each element of the defense. (*Aguilar, supra*, 25 Cal.4th at p. 851; *Dailey v. City of San Diego, supra*, 223 Cal.App.4th at p. 249.) Marotta did not offer such evidence. Its motion for summary adjudication should have been denied.

### III. *OCWD Act*

#### A. *Recoverable Costs*

The District contends the trial court erred by summarily adjudicating its cause of action under section 8 of the OCWD Act in favor of defendants. That section empowers the District to "conduct any investigations of the quality of the surface and groundwaters

59

within the district . . . to determine whether those waters are contaminated or polluted" (OCWD Act, § 8, subd. (a)), to "perform any cleanup, abatement, or remedial work . . . needed to prevent, abate, or contain any threatened or existing contamination of, or pollution to, the surface or groundwaters of the district" (*id.*, subd. (b)), and to seek recovery of its reasonable costs from "the person causing or threatening to cause that contamination or pollution" in a civil action (*id.*, subd. (c)).

The OCWD Act, section 8, subdivision (c) therefore creates a private right of action for cost recovery specific to the District:  "If, pursuant to subdivision (b), the contamination or pollution is cleaned up or contained, the effects thereof abated, or in the case of threatened contamination or pollution, other necessary remedial action is taken, the person causing or threatening to cause that contamination or pollution shall be liable to the district to the extent of the reasonable costs actually incurred in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action.  The amount of those costs, together with court costs and reasonable attorneys' fees, shall be recoverable in a civil action by, and paid to, the district."  (*Ibid.*)

Defendants argue, here as in the trial court, that summary adjudication is proper because the District has not incurred any recoverable costs under the OCWD Act, section 8, subdivision (c).  Defendants characterize the District's incurred costs as wholly "investigatory" and contend that investigatory costs are not encompassed within recoverable remediation costs.  Defendants point to the express inclusion of the term "investigations" in section 8, subdivision (a), and the absence of that term in section 8,

60

subdivisions (b) and (c), which authorize and provide for cost recovery of cleanup, abatement, and remedial work.

We addressed and rejected this unwarranted distinction in our recent *Alcoa* opinion:  "On de novo review, we conclude the trial court incorrectly restricted the scope of recoverable costs under the OCWD Act.  The issue is not whether the claimed costs fall under the District's power under section 8, subdivision (a) and are therefore excluded.  It is whether the claimed costs fall under section 8, subdivisions (b) and (c) and are therefore included.  A given action, for example, might fall under both grants of power."  (*Alcoa, supra*, 12 Cal.App.5th at p. 346.)  We concluded it was error to view the subdivisions as mutually exclusive.  (*Ibid.*)  We have considered defendants' arguments to the contrary but for the reasons more fully explained in *Alcoa* will adhere to our interpretation of the OCWD Act in that appeal.

The "reasonable costs actually incurred in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action" are recoverable under the OCWD Act, without regard to whether they could also be characterized as investigatory.  (OCWD Act, § 8, subd. (c).)  "[A] remedial action involves much more than simply the physical cleanup or containment process itself.  It involves investigation, planning, design, development, and documentation.  Because these activities are part of remedial action, the costs of such activities are recoverable."  (*Alcoa, supra*, 12 Cal.App.5th at p. 346.)  However, not every activity that touches on environmental concerns can be characterized as remedial.  As we explained, "if a plaintiff conducts testing as part of its 'regular course of business,' and not

61

in response to contamination or threatened contamination, that could indicate that such testing is not remedial action. [Citation.] Similarly, if a plaintiff drafts reports that have 'nothing to do with remedying threatened contamination,' that could indicate that the reports are not part of a remedial action." (*Id.* at p. 348.)

In their motion for summary adjudication, defendants showed that the District had not designed or constructed any remediation project in the South Basin; had not done any cleanup work or treated any groundwater contamination there; and planned to continue investigating the source and extent of groundwater contamination in the South Basin in order to develop a remediation plan. In opposition, the District did not directly contest these points. Instead, it offered, among other things, a declaration from its chief hydrogeologist explaining that the District's efforts were part of the remediation process and that those efforts were necessary if the District wanted to clean up contamination in the South Basin effectively. The hydrogeologist noted that some "investigatory" elements, such as groundwater monitoring wells installed by the District, would continue to be used as part of any cleanup and treatment effort. Other claimed costs included design and feasibility studies of various treatment options themselves.

On this record, defendants have not shown that all of the District's claimed remediation costs are not recoverable as a matter of law. As we have explained, the fact that the District's costs can be characterized as "investigatory" is not dispositive, which was the primary argument advanced in the trial court and on appeal. And, because the District's activities were undertaken in response to actual and threatened contamination and pollution and at least some could reasonably be understood as necessary for any

62

future treatment project, a triable issue of fact exists regarding whether the District's costs are remedial in nature and therefore recoverable. The court therefore erred by granting defendants' motion for summary adjudication of the District's cause of action under the OCWD Act. Except as to UCI, which we discuss in the next part, we express no opinion regarding whether summary adjudication would be proper on a different record or on different grounds or whether the District should ultimately prevail on this (or any other) element of this cause of action were it to be tried.[18]

## B. *Causation: UCI*

The OCWD Act allows the District to recover its reasonable costs from a person who caused or threatened to cause the contamination or pollution at issue. (OCWD Act, § 8, subd. (c).) Unlike the HSAA, the OCWD Act largely incorporates the causal nexus between a defendant's conduct and the resulting harm: "[T]he OCWD Act requires proof

---

[18] At oral argument, defendants appeared to offer an additional reason why summary adjudication of the District's claim under the OCWD Act was proper. They argued that the District had not shown that "contamination or pollution [was] cleaned up or contained, the effects thereof abated, or in the case of threatened contamination or pollution, other necessary remedial action [was] taken," as required for cost recovery under the OCWD Act. (OCWD Act, § 8, subd. (c).) They attempted to distinguish our discussion of this element in *Alcoa* by pointing out that, unlike in *Alcoa*, the District had not offered any evidence that the hazardous substances in the South Basin had naturally attenuated, or "abated," such that this element was not satisfied. (See *Alcoa, supra*, 12 Cal.App.5th at pp. 349-350.) Defendants did not develop this argument in their briefing. They discussed the results of the District's actions only to support their argument that those actions were merely investigatory. Defendants' argument is therefore waived. (*Ace American, supra*, 121 Cal.App.4th at p. 1027, fn. 2.) And, even setting aside this waiver, we agree with the District that the defendants have not shown, based on the undisputed facts, that there is no "threatened contamination or pollution" that would support cost recovery for "other necessary remedial action" undertaken by the District, even in the absence of evidence that the effects of existing contamination or pollution have been abated. (See OCWD Act, § 8, subd. (c); *Alcoa, supra*, 12 Cal.App.5th at pp. 350-351.)

63

that a defendant itself caused or threatened to cause contamination or pollution for which the District has incurred remediation costs." (*Alcoa, supra*, 12 Cal.App.5th at p. 342.)

UCI moved for summary adjudication of the District's claim under the OCWD Act, among others, because the District could not establish causation. The trial court agreed and granted summary adjudication of the District's OCWD Act claim on this basis. On appeal, UCI argues this order provides an alternative basis on which to affirm the judgment in its favor on this claim. The District contends the court's order was erroneous. For reasons we will explain, we agree with UCI.

We have already summarized the evidence surrounding the UCI site in part II.C.7., *ante*. Based on our review of that evidence, we conclude UCI met its burden on summary adjudication. UCI's evidence, if credited, would preclude a trier of fact from concluding that UCI caused groundwater contamination. Dagdigian, UCI's expert, opined that the 1979 fire was the cause of VOC contamination at the UCI site. Because the District does not contend UCI was responsible for the 1979 fire, it cannot show UCI caused the VOC contamination at issue in this litigation. The District criticizes Dagdigian's expert opinion by pointing out his admission that 1,1,1-TCA's half-life could be as low as 1.1 years or as high as 2.5 years. But the fact that other possibilities exist does not call into question Dagdigian's conclusion that 1.7 years was the appropriate half-life to use in his analysis of the UCI site. Absent some other evidence, it is speculation to believe that using another half-life figure would have been reasonable under the circumstances here.

64

We further conclude the District has not established a triable issue of fact whether UCI caused groundwater contamination based on its evidence of UCI's manufacturing processes. At most, the District has shown that UCI spilled some amount of 1,1,1-TCA on the floor of its facility and discharged it into the sewer. The District submitted no evidence, expert or otherwise, that would allow a trier of fact to infer based on this evidence that UCI's actions caused or threatened to cause groundwater contamination. The District argues that a reasonable inference of contamination by UCI can be based on the (allegedly similar) circumstances of the 1979 fire, but any inferences based on that fire would be speculative given the state of the evidence. While the 1979 fire indisputably caused groundwater contamination, the same cannot be said of UCI's minor spills based on the evidence the District presented. The District has not shown the trial court erred by summarily adjudicating its claim under the OCWD Act based on causation.[19]

## IV. *Negligence*

### A. *Overview of Disputed Issues*

Defendants challenged the District's negligence claim on the ground it was barred by the applicable statute of limitations. Below, we will first address the legal issues raised by defendant's challenge. For reasons we will explain, we conclude the theory of "continuous accrual" applies to the District's negligence claim and provides the framework for assessing defendants' arguments based on the statute of limitations. We

---

[19] Given our conclusion, we again need not decide whether the deposition transcripts of former employees Stoll and Paulk were admissible. (See fn. 16, *ante*.)

next address defendants' factual showing to determine whether they are entitled to summary adjudication on this ground, including the additional arguments made in GE Aviation's separate respondent's brief. We conclude that, except for GE Aviation, defendants have not shown they are entitled to summary adjudication of the District's negligence claim on statute of limitations grounds on the current record.

As with the District's claim under the OCWD Act, UCI moved separately for summary adjudication of the District's negligence claim on the ground the District could not show causation. We conclude, for the same reasons as under the OCWD Act, that UCI is entitled to summary adjudication of the District's negligence claim on this ground as well.

## B. *Statute of Limitations*

### 1. *The Defendants Jointly*

The District contends the trial court erred by summarily adjudicating its negligence claim against all defendants based on the statute of limitations. In a series of motions, defendants offered evidence that the District knew or should have known about contamination at each of their sites more than three years before the District filed its complaint. Defendants argued that the District's actual or constructive knowledge of such contamination triggered the statute of limitations, which they claim expired before the District filed suit. In the trial court, the District primarily argued that its knowledge was insufficient to trigger the statute of limitations. On appeal, the District has abandoned this argument. Instead, the District relies on the theory of "continuous accrual" to defend its negligence claim. It contends summary adjudication was erroneous because its

66

complaint alleged a series of negligent acts and, regardless of the District's first knowledge of contamination, the defendants have not met their burden of showing that their last negligent act occurred outside the statute of limitations. (See *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192 (*Aryeh*).) For reasons we will explain, we agree with the District.

Defendants claim, as an initial matter, that the District has forfeited its appellate arguments by failing to raise them below. Defendants rely on *NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222 (*NBCUniversal*). In that case, the real parties in interest in a writ proceeding sought to raise arguments in opposition to summary judgment that they had not raised in the trial court. (*Id.* at p. 1236.) The new argument in *NBCUniversal* mirrors the new argument here, that the theory of continuous accrual precluded a defense based on the statute of limitations. (*Ibid.*) The appellate court concluded that the real parties had forfeited their continuous accrual argument by not making it below. (*Id.* at p. 1237.) The court supported its conclusion by observing that "resolution of the argument requires application of equitable principles to a factual record that [real parties] have failed to develop." (*Ibid.*) The court therefore declined to exercise its discretion to consider the new continuous accrual argument. (*Ibid.*)

We do not find *NBCUniversal* persuasive under the circumstances here. Even assuming the District forfeited its argument by not making it below (a claim the District disputes), the District's argument presents a purely legal question (the sufficiency of defendants' initial evidentiary showing) that does not depend on factual development in the trial court. As in *NBCUniversal*, defendants claim the District's argument requires

67

application of equitable principles.  But defendants do not identify any such alleged equitable principles, they do not discuss any equitable principles in their discussion of the merits of the District's continuous accrual argument, and they do not identify any *factual* development in the trial court that they would have pursued had the District made its argument below.  The defendants have not identified any prejudice from considering the District's continuous accrual argument, and they do not assert that the District's failure to make the argument in the trial court was for purposes of delay or the result of some other improper motive.  Under these circumstances, even assuming the forfeiture rule otherwise applies, we will exercise our discretion and consider the District's argument on its merits.  (See *Francies v. Kapla, supra*, 127 Cal.App.4th at p. 1386.)

In *Aryeh*, the Supreme Court explained the legal theory of continuous accrual: "Generally speaking, continuous accrual applies whenever there is a continuing or recurring obligation:  'When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.' [Citation.]  Because each new breach of such an obligation provides all the elements of a claim—wrongdoing, harm, and causation [citation]—each may be treated as an independently actionable wrong with its own time limit for recovery." (*Aryeh, supra*, 55 Cal.4th at p. 1199.)  A plaintiff may pursue actionable wrongs for which the statute of limitations has not yet expired, even if earlier wrongs would be barred.  (*Id.* at pp. 1199-1200.)  "[U]nder the theory of continuous accrual, a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable

68

limitations period." (*Id.* at p. 1192.) A plaintiff may allege a single cause of action covering the entire series of actionable wrongs: "[N]othing in the theory of continuous accrual requires every severable act to be pleaded as a distinct cause of action[.]" (*Id.* at p. 1201, fn. 8.)

In its operative complaint, the District alleged that "[d]efendants had a duty to use due care in the handling, control, disposal, release, remediation, and use of hazardous substances at their respective sites." Defendants breached these duties because they "negligently, carelessly, and recklessly failed to: (1) prevent spills, leaks, discharges and releases of VOC's and perchlorate through the use of appropriate technology; (2) install and maintain systems to prevent spills, leaks, discharges and releases, and facilitate prompt detection and containment of any spills, leaks, discharges and releases; (3) monitor and discover spills, leaks, discharges and releases as soon as possible; (4) warn those who maybe injured as a result of spills, leaks, discharges and releases; and (5) clean up, contain and abate spills, leaks, discharges and releases to prevent harm and injury to plaintiff and others." In addition, "[d]efendants undertook to retain consultants to conduct environmental investigations and cleanups, thereby affirmatively undertaking the duty to detect and remediate spills, leaks, discharges and releases of VOC's and perchlorate. Defendants, however, negligently failed to properly discharge these duties."

The District's allegations in support of its negligence causation of action identify a series of activities, spanning the initial handling and use of hazardous substances to their disposal, release, and remediation. Although couched in past tense, the complaint alleges

69

a series of negligent acts.[20] Under the doctrine of continuous accrual, if any of these negligent acts occurred within the statute of limitations, the cause of action is not barred. (*Aryeh, supra*, 55 Cal.4th at pp. 1199-1200.)

Defendants point out that *Aryeh* involved a claim under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.). (*Aryeh, supra*, 55 Cal.4th at p. 1189.) They argue that the theory of continuous accrual does not apply to negligence claims, but they do not provide any reasoning supporting their argument. We see no reason why the theory of continuous accrual should not apply to negligence claims. (See *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 940 ["Such a rule has a long history in nuisance actions [citation] and by analogy may apply to certain factual situations causing personal injury as well as property damage for negligence and zoning violations."].) We will therefore apply it here.

Defendants bore the burden on summary judgment to show a "complete defense" to the District's negligence claim based on the statute of limitations. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 849.) Because the District's complaint pled its negligence claim as a series of separate and distinct negligent acts under the theory of continuous accrual, defendants were required to show that the

---

[20]    The parties make much of the tense of the complaint's allegations. The District emphasizes allegations made in the present or present progressive tense ("[d]efendants . . . [are] causing and threatening to cause contamination and pollution"), and defendants emphasize past tense allegations. We need not definitely resolve the scope of the District's allegations in the appeal. Even focusing exclusively on the past tense allegations, they allege a series of negligent acts (albeit in the past). We disagree with defendants' contention that these past tense allegations describe a single negligent act for each defendant.

70

District's claim, including each relevant negligent act, was completely time-barred. " 'If a plaintiff pleads several theories, the defendant has the burden of demonstrating there are no material facts requiring trial on any of them. "The moving defendant whose declarations omit facts as to any such theory . . . permits that portion of the complaint to be unchallenged." ' " (*Teselle, supra*, 173 Cal.App.4th at p. 163.) This principle applies equally to facts pled in a complaint that would refute an affirmative defense or prove an exception to such a defense. (See, e.g., *Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 880; *Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 651; *Bacon v. Southern California Edison Co.* (1997) 53 Cal.App.4th 854, 858.)

Defendants did not meet their initial burden of production. Defendants did not present evidence, for example, that a negligence claim based on improper remediation would be time-barred. Because a negligence claim based on such a theory remains viable notwithstanding defendants' evidence, their motions for summary adjudication of the District's negligence claims based on the statute of limitations should have been denied. (*Aguilar, supra*, 25 Cal.4th at p. 850; *Teselle, supra*, 173 Cal.App.4th at pp. 169-170.)

Defendants argue that the District has alleged "a single harm occurring solely in the past," i.e., "contamination of groundwater." But such contamination need not be a single, indivisible harm. Separate negligent acts could reasonably lead to more or different contamination, contamination with different effects, or contamination requiring different remediation efforts. For example, a defendant's negligent release of hazardous substances could cause some groundwater contamination. A defendant's later negligent

71

remediation effort could cause additional groundwater contamination, in different areas, with different effects. Even though both negligent acts caused groundwater contamination, the contamination is not a single harm.[21]

Defendants also argue that the District's allegations against certain specific defendants should override more general allegations against all defendants collectively. It is well-settled that "specific allegations control general pleadings," but this rule applies only where there is a factual inconsistency between the allegations. (*Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 827.) The past-tense allegations against specific defendants and the past-tense allegations against all defendants supporting the District's negligence claim are not inconsistent. There is no basis to disregard the latter allegations. The District's general allegations provided the applicable framework the defendants must follow in order to obtain summary adjudication.

In a footnote, defendants claim in passing that they provided evidence showing that certain defendants (Emerson, Soco West, Brenntag, and UNISYS) "ceased any operations that could have [led] to any alleged releases long before" that statute of limitations period. Although the evidence cited by defendants shows that certain activities ceased outside the limitations period, defendants do not establish that the

---

[21]    We further disagree with defendants that the District's negligence claim is based solely on the idea "the persistence of contaminants in groundwater indefinitely tolls the statute of limitations." The District's claim is instead based on the idea that defendants are responsible for negligent acts within the statute of limitations. Defendants' reliance on *CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525 is unpersuasive. In that case, the evidence showed that the harm from contamination was "complete[]" and "constant" outside the statute of limitations period. (*Id.* at p. 1535.) Defendants here make no such showing.

District's claim is based solely on those activities. Nor do defendants cite evidence that they did not engage in other activities alleged by the District in support of its negligence claim during the statute of limitations period. Emerson cites a 1999 site closure letter in which the RWQCB states, "On the condition that the information provided to us was accurate and representative of existing groundwater conditions at the site, no further investigation or remediation of groundwater is required." This letter does not address any later activities at the site. Emerson does not cite any evidence (e.g., a declaration from a responsible employee) that it has not undertaken any activities that could have caused groundwater contamination within the statute of limitations period. The discrete pieces of evidence cited by the other defendants at issue suffer from the same deficiencies. The 1991 letter cited by Soco West and Brenntag states that the site at issue "ceased processing hazardous waste" and "all containment areas have been decontaminated." But the letter does not address other negligent acts alleged by the District. Indeed, the letter mentions that hazardous waste remains at the site and soil and groundwater investigations are ongoing. UNISYS relies on deposition testimony showing that it sold the company that operated the site at issue in 1986. Again, this evidence does not address the various negligent acts alleged by the District other than direct operation of the site.

Given the breadth of the District's complaint, it was incumbent upon defendants in their motions for summary adjudication to address each allegation that could reasonably form the basis of the District's negligence cause of action, including defendants' potential negligent remediation activities. Having failed to do so, defendants did not meet their initial burden to show the District's negligence claim had no merit. On a different factual

73

record, including discovery clarifying the scope of the District's allegations, summary adjudication might have been warranted. But on the current record the court's order granting summary adjudication must be reversed. Our discussion of this issue does not preclude defendants from raising the issue of statute of limitations again, of course, in an appropriate manner and with additional facts regarding, for example, defendants' lack of involvement in remediation and other activities forming the basis of the District's negligence claim.

## 2. *GE Aviation*

In its separate respondent's brief, GE Aviation offers a variation of the foregoing factual argument. It points to the following material fact contained in its motion, which it contends is undisputed: "There is no record evidence of any chlorinated solvent contamination, as defined by the solvents placed at issue by the District, to soil or groundwater at the 2040 Site as a result of any operations at the 2040 Site conducted from September 1, 1997 to the present." This fact sweeps more broadly than the evidence cited by Emerson, Soco West, Brenntag, and UNISYS cited above. The fact, if true, would cover any operations at the site in question throughout the statute of limitations period. And, because the District's negligence allegations are limited to each defendant's activities at its respective site, it would cover all of the District's negligence allegations. We therefore conclude that the fact, if true, would establish a complete defense to the District's negligence allegation based on the statute of limitations.

In this appeal, the District addresses GE Aviation's evidentiary showing in a single sentence: "In addition, the District submitted evidence showing that . . . GE Aviation

74

continued releasing contaminants through 2011." This sentence is supported by a citation solely to the District's separate statement in opposition to GE Aviation's allegedly undisputed fact. As we have noted, such a citation is improper and insufficient. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Jackson, supra*, 60 Cal.App.4th at p. 178, fn. 4.) Despite GE Aviation's separate respondent's brief addressing this claim, the District offers no response in its reply brief.

As the appellant, the District bears the burden of showing error in the judgment. (*Reyes v. Kosha, supra*, 65 Cal.App.4th at p. 466, fn. 6.) Here, the District's general assertions do not apply to GE Aviation, and the District makes no attempt to engage in the facts surrounding GE Aviation's site. Its only acknowledgement that GE Aviation's factual showing merits attention is accompanied by a citation that violates the Rules of Court. The District has not made a serious effort to advance its argument on appeal.[22] Because the District has failed to support its assertion with reasoning or authority, we conclude the District has forfeited its claim of error as to GE Aviation. (*Schmidt, supra*, 223 Cal.App.4th at p. 1509; *Cahill, supra*, 194 Cal.App.4th at p. 956.) We will therefore affirm the judgment in favor of GE Aviation as to the District's negligence claim.

### C. *Causation: UCI*

UCI separately moved for summary adjudication of the District's negligence claim, among others, on the ground that the District could not establish causation. The

---

[22] Although the District addresses the facts surrounding the GE Aviation site in the context of its HSAA claim, that claim was the subject of a different summary adjudication motion and involves different legal standards. It does not apply to the District's negligence claim, and the District does not attempt to incorporate it here.

trial court granted UCI's motion and expressly relied on this ground in summarily

adjudicating the District's negligence claim in favor of UCI. The District contends the

court's order was erroneous, whereas UCI relies on this ground as an alternative basis on

which to affirm the judgment in its favor on the District's negligence claim. We agree

with UCI.

We have already discussed the evidence surrounding the UCI site, including

causation, in connection with the District's claims under the HSAA and the OCWD Act.

(See parts II.C.7. and III.B., *ante*.) With respect to the OCWD Act, we concluded UCI

met its burden on summary adjudication to show no triable issue of fact on the issue of

whether UCI caused groundwater contamination and the District did not raised any

triable issues in opposition. The legal standards of causation under the OCWD Act and

the common law claim of negligence are identical in the context of the parties'

contentions in this appeal. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239-1240;

*Alcoa, supra*, 12 Cal.App.5th at pp. 342.) That discussion therefore applies equally here.

The District does not offer any additional arguments in opposition. We will therefore

affirm the trial court's judgment in favor of UCI and against the District on its negligence

claim.

## V. *Trespass and Nuisance*

### A. *The Causes of Action*

The District alleged causes of action for common law trespass and nuisance

against all defendants. The trial court granted defendants' motions for summary

adjudication of these causes of action. As discussed above, the court primarily found that

76

the District did not have sufficient property or other interests in the South Basin to support claims for trespass or nuisance. For reasons we will explain, we conclude the District has raised a triable issue of fact regarding its property interests in groundwater in the South Basin, but those interests are insufficient to sustain a trespass cause of action under the circumstances here. The District's potential property interests are sufficient, however, to sustain its nuisance cause of action.

Because both causes of action require some form of property interest (at least in part), we will consider them together in this section. We begin with an overview of each cause of action and will then discuss the District's potential property interests in groundwater in the South Basin.

"Trespass is an unlawful interference with possession of property." (*Staples v. Hoefke* (1987) 189 Cal.App.3d 1397, 1406; see *Wilson v. Interlake Steel Co.* (1982) 32 Cal.3d 229, 233 (*Wilson*).) "California has adhered firmly to the view that '[t]he cause of action for trespass is designed to protect *possessory*—not necessarily ownership— interests in land from unlawful interference. [Citations.]' " (*Capogeannis v. Superior Court* (1993) 12 Cal.App.4th 668, 674; see *Williams v. Goodwin* (1974) 41 Cal.App.3d 496, 507-508 (*Williams*).) "[I]t is not necessary that the plaintiff own the property. All plaintiff needed to do was to show a possessory right superior to the right of the trespassers." (*Posey v. Leavitt* (1991) 229 Cal.App.3d 1236, 1246 (*Posey*).)[23]

_____

[23]     The District contends that "trespass on the case" is a viable tort in California that does not require a property interest. Although the District did not raise this argument in the trial court, it contends the judgment on its trespass claim should be reversed because

Nuisances are defined by statute: "Anything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." (Civ. Code, § 3479.) Nuisances can be either public or private. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (*Id.*, § 3480.) Any other nuisance is a private nuisance. (*Id.*, § 3481.)

---

it can prevail under the standards applicable to a cause of action for trespass on the case. Even assuming the District's complaint can be read to plead a cause of action for trespass on the case, and even exercising our discretion to consider the District's new argument for the first time on appeal, we disagree. To the extent trespass on the case remains a viable tort in California, it does not apply to the circumstances here. Historically, trespass on the case was a common law form of action that encompassed a wide variety of causes of action that we now consider separate. Chief among them was negligence. (See Rest.3d Torts, § 6, com. c, p. 61.) For example, an early Supreme Court opinion on negligence relies on a treatise discussing trespass on the case for the applicable standards. (*Gerke v. California Steam Navigation Co.* (1858) 9 Cal. 251, 256, citing 1 Cowen & Barbour, *A Treatise on the Civil Jurisdiction of Justices of the Peace in the State of New York* (3d ed. 1844) p. 384.) California no longer adheres to the common law forms of action. (Code Civ. Proc., § 307; see *Rogers v. Duhart* (1893) 97 Cal. 500, 504.) And, to the extent trespass on the case survived as a counterpart to the modern cause of action for trespass (one that would allow recovery of additional damages), that distinction has been abolished. All such actions are now known as trespass. (*Elton v. Anheuser-Busch Beverage Group, Inc.* (1996) 50 Cal.App.4th 1301, 1305.) The District relies on a single modern case, *Lucky Auto Supply v. Turner* (1966) 244 Cal.App.2d 872 (*Lucky Auto*), to support its argument. In that case, the court held that a plaintiff with a nonexclusive license to a parking lot could bring a cause of action under the theory of trespass on the case for " ' "any invasion or disturbance of the terms of the license whether by the licensor or by third parties." ' " (*Id.* at p. 881.) To the extent *Lucky Auto* is correct that a license is sufficient to support a separate cause of action for trespass on the case, the District does not allege that it has a license or any analogous interest here. We disagree with the District that *Lucky Auto* stands for the broad proposition that any perceived wrong may be remedied in an action for trespass on the case. The District has numerous other remedies, including under the OCWD Act. (See part III., *ante*.)

A private plaintiff may bring a cause of action for public nuisance if the nuisance is "specially injurious" to the plaintiff. (Civ. Code, § 3493.) Although a plaintiff's property interests may be relevant to the issue of special injury, property interests are not required to bring a cause of action for public nuisance. (See, e.g., *In re Firearm Cases* (2005) 126 Cal.App.4th 959, 987, fn. 21.) By contrast, a plaintiff bringing a cause of action for private nuisance must show harm to a property interest. (*Institoris v. City of Los Angeles* (1989) 210 Cal.App.3d 10, 20 (*Institoris*).) The property interest need not rise to the level of fee simple ownership. (See, e.g., *Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 574 [interference with the use of an easement]; *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 920 [interference with use of a leasehold].)[24]

B. *The District's Property Interests*

Because each cause of action involves some type of property interest, either as a necessary or potentially sufficient element, we will examine the nature of the District's alleged property interests relevant to this appeal. We do not by this discussion imply that

---

[24]    Although the District is a public agency, the parties agree that a public agency may bring a nuisance cause of action on its own behalf to the same extent as a private plaintiff, and under theories of both private and public nuisance, where the public agency's own property rights are affected by the nuisance. The statutory basis for such an action is found in the first sentence of Code of Civil Procedure section 731: "An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor." (See *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 313; *Orange County Water Dist. v. The Arnold Engineering Co.* (2011) 196 Cal.App.4th 1110, 1125, fn. 4.)

the property interests implicated by each cause of action are identical.  As we will explain in the next part, they are not.

The District has alleged that it has property interests in groundwater in the South Basin.  It acknowledges that it does not have property interests in the overlying land.  It instead alleges property interests in or related to the groundwater itself.  As we will discuss in greater detail below, water in its natural state cannot be owned by any private person.  (*State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1025 (*State of California*).)  Property interests in water instead take the form of a usufruct, i.e., a right to use.  " 'It is laid down by our law writers, that the right of property in water is usufructuary, and consists not so much in the fluid itself as the advantage of its use.' [Citation.]  Hence, the cases do not speak of the ownership of water, but only of the right to its use."  (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441 (*Audubon Society*).)

"Courts typically classify water rights in an underground basin as overlying, appropriative, or prescriptive.  [Citation.]  An overlying right, 'analogous to that of the riparian owner in a surface stream, is the owner's right to take water from the ground underneath for use on his land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto.' "  (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1240, fn. omitted (*City of Barstow*).)  Appropriative and prescriptive rights are derived from actual appropriation or use of water.  (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 278-279 (*City of Santa Maria*).)  Appropriative rights stem from lawful use; prescriptive rights from unlawful use.  (*Ibid.*;

80

*City of Barstow*, at p. 1241; see generally *Audubon Society, supra*, 33 Cal.3d at pp. 441-442.)

The District's alleged property interests in groundwater fall into three categories: (1) property interests based on a delegation of rights from the State of California, (2) property interests based on the District's regulatory powers, and (3) property interests based on its recharge activities in the Orange County groundwater basin. We will address each in turn below.

For reasons we will explain, we conclude that the District has not raised a triable issue of material fact that it has any relevant property interests based on any delegation of rights from the State of California or the District's regulatory powers. We agree with the District, however, that on the current record defendants have not established, for purposes of summary adjudication, that the District has no relevant property interests based on its recharge activities in the Orange County groundwater basin. Specifically, the current record leaves open the possibility that the District enjoys appropriative water rights to groundwater in the basin. We will address the consequences of that conclusion for the District's causes of action for trespass and nuisance in part V.C., *post*.

1. *Property Interests Based on State Delegation of Rights*

The District contends the State of California has delegated its rights over groundwater in the South Basin to the District. It relies on a provision of the OCWD Act, which states in relevant part as follows: "The right-of-way is hereby given, dedicated and set apart to locate, construct and maintain any of the works of the district over and through any of the lands which are now, or may become the property of this state and

81

also there is given, dedicated and set apart, for the uses and purposes aforesaid, all waters and water rights belonging to this state within the district." (OCWD Act, § 39.) Defendants disagree with the District's broad interpretation. They argue that this sentence, read in context, relates only to flood control. For purposes of this appeal, we will assume without deciding that the District enjoys whatever water rights the State may have in groundwater in the Orange County groundwater basin under section 39 of the OCWD Act. But we conclude, for reasons we will explain, that these rights are insufficient to maintain causes of action for trespass or private nuisance.

"All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law." (Wat. Code, § 102.) On its face, this statute would appear to confirm the State's property interest in groundwater in the South Basin. But it has not been read so broadly. As the Supreme Court has explained, "The state's interest in the public groundwater and surface waters is to make water policy that preserves and regulates it. The state does not have the right to possess and use the water to the exclusion of others and has only such riparian[25], overlying, or appropriative rights as it may obtain by law; its interest is therefore not an ownership interest, but rather a nonproprietary, regulatory one." (*City of Barstow, supra*, 23 Cal.4th at p. 1237, fn. 7.) The statute's reference to "the people of the

---

25    Riparian rights are water rights enjoyed by landowners whose property abuts surface water. (*People v. Shirokow* (1980) 26 Cal.3d 301, 307 (*Shirokow*); see generally *Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 751-754.) Because this appeal involves groundwater, and not surface water, riparian rights are not at issue.

82

State," rather than the State itself, confirms the State's interest is an abstract one, not a proprietary one.  (Wat. Code, § 102; see *State of California, supra*, 78 Cal.App.4th at p. 1026.)[26]

In *State of California*, our colleagues in Division Two of this court undertook a comprehensive examination of the State's interests in groundwater.  They concluded that the State "does not 'own' the water of the state in its natural conditions . . . .  [T]he state does *not* have the right to 'possess and use [the water] to the exclusion of others' and has only such riparian or appropriative rights as it may otherwise obtain by law."  (*State of California, supra*, 78 Cal.App.4th at p. 1027, fn. omitted.)  "[T]he State's 'ownership' under Water Code section 102 confers *no* powers of possession or use upon it."  (*Id.* at p. 1028.)  Instead, "Water Code section 102 is an example of what the United States Supreme Court has called a ' " 'fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' ". . .'  [Citation.] . . .  [Citation.]  Water Code section 102 thus

---

26     Water Code section 102 therefore differs from the statute confirming the State's interest in *land* underlying the State's navigable waters and tidal areas.  The latter statute provides as follows:  "*The State* is the owner of all land below tide water, and below ordinary high-water mark, bordering upon tide water within the State; of all land below the water of a navigable lake or stream; of all property lawfully appropriated by it to its own use; of all property dedicated to the State; and of all property of which there is no other owner."  (Civ. Code, § 670, italics added.)  "The State *is* considered to hold '*title* as trustee to such lands and waterways . . . .'  (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434 [italics added].)  Thus, the use of the term 'The State' in section 670 appropriately conveys the sense that the State, as a governmental entity, owns the tidelands and waterways."  (*State of California, supra*, 78 Cal.App.4th at p. 1025.)  Authorities considering the State's property interests in tidelands and navigable waterways therefore do not directly apply to the State's interests in surface and ground waters.

expresses the preeminent right of the *people* of the State to make water policy and control water usage; it may perhaps also have been intended as a preemptive strike against any private effort to claim 'ownership' in a proprietary sense. But the State's power under the Water Code is the power to control and regulate use; such a power is distinct from the concept of 'ownership' as used in the Civil Code and in common usage." (*Id.* at p. 1030, fn. omitted.) In sum, "[t]he State 'owns' the groundwater in a regulatory, supervisory sense, but it does not own it in a possessory, proprietary sense." (*Id.* at p. 1033.)

The conclusions of *State of California* were adopted by the Supreme Court in *City of Barstow*, with citation, in the passage quoted above. (*City of Barstow, supra*, 23 Cal.4th at p. 1237, fn. 7, citing *State of California, supra*, 78 Cal.App.4th at p. 1027.) The District's critiques of *State of California* are therefore foreclosed, and we find *State of California*'s reasoning persuasive in any event.[27]

A recent opinion relied on *State of California* to reverse a defendant's conviction for petty theft of water from a flowing stream, reasoning that neither the State nor any private person had a possessory interest in such water. (*People v. Davis* (2016) 3 Cal.App.5th 708, 710-711, 714 (*Davis*).) *Davis* explained, "*State of California* makes clear that the state in its role as public trustee does not have any *proprietary ownership* of public waters, beyond any riparian or appropriative rights it might acquire as a property owner." (*Id.* at p. 714.) "A characterization of a state as a 'trustee' is merely a legal

---

27    We similarly concur with *State of California*'s interpretation of the Supreme Court's opinion in *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, and we reject the District's reliance on that opinion for the same reasons. (See *State of California, supra*, 78 Cal.App.4th at pp. 1028-1029.)

84

fiction of the 19th century expressing the state's police power over its resources." (*Ibid.*) It concluded, "While the People may prosecute defendant for transgressing the state's regulatory police power [citation], they do not provide any authority to counter the above stated principle that their ability to regulate his behavior does not create any possessory interest in the water that constitutes larceny." (*Id.* at p. 715.)

While *City of Barstow*, *State of California*, and *Davis* do not consider causes of action for trespass or private nuisance, their conclusions regarding the State's interests in groundwater establish that those causes of action are untenable here. Like larceny, trespass requires the invasion of a superior possessory interest in property. (Compare *Davis, supra*, 3 Cal.App.5th at p. 713 with *Posey, supra*, 229 Cal.App.3d at p. 1246.) Because the State does not have a general possessory interest in groundwater, the District cannot support a cause of action for trespass based on the State's interest. Similarly, a cause of action for private nuisance requires harm to a property interest. (*Institoris, supra*, 210 Cal.App.3d at p. 20.) The State, however, has no general propriety (i.e., property) interest in groundwater; its interest is regulatory and supervisory. (*City of Barstow, supra*, 23 Cal.4th at p. 1237, fn. 7; *State of California, supra*, 78 Cal.App.4th at p. 1034.) Such a regulatory and supervisory interest is not a property interest that can support a cause of action for private nuisance either.

The District points out that an earlier opinion, *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1618 (*Selma*), held that the State's interest in groundwater may be a sufficient property interest to support damages in a public nuisance cause of action. *Selma* was an appeal at the pleading stage, following

85

the sustaining of several demurrers.  (*Id.* at p. 1606.)  The reviewing court considered whether a cause of action for equitable indemnity could rest on a potential claim for damages by the State in an action for public nuisance.  (*Id.* at pp. 1611, 1619.)  After reviewing Water Code section 102 and subsequent case law, *Selma* observed, "[B]oth statute and case law suggest the state has a legally cognizable property interest in the waters of the state."  (*Id.* at p. 1616.)  And, as alternate theories, *Selma* identified conventional water rights (e.g., riparian or appropriative) and the State's *parens patriae* role in protecting public resources.  (*Id.* at p. 1618.)  *Selma* concluded that the complaint sufficiently stated a cause of action for equitable indemnity based on a damages claim by the State.  (*Id.* at p. 1619.)

The reasoning in *Selma* has been undermined by the more recent opinions discussed above, most importantly the Supreme Court's statement—contrary to *Selma*— that the State's interest in groundwater is "a nonproprietary, regulatory one."  (*City of Barstow, supra*, 23 Cal.4th at p. 1237, fn. 7.)  *State of California* criticized the reasoning of *Selma* and the authorities on which it relies, and for the same reasons we agree *Selma* is unpersuasive.  (See *State of California, supra*, 78 Cal.App.4th at p. 1029, fn. 15.) *Selma*'s conclusion that the State's *parens patriae* role confers a "legally cognizable interest" is inapplicable here.  Whatever the meaning of the OCWD Act, its delegation was limited at most to "waters and water rights belonging to this state within the district." (OCWD Act, § 39.)  The State's *parens patriae* role, and its powers and duties flowing from that role, are not "waters and water rights" within the meaning of section 39 of the OCWD Act.  The District cannot assert *parens patriae* rights to support its nuisance

86

claim. And, as for conventional water rights, the District has made no allegation that the

State has such rights within its territory that the District now enjoys. The State's

delegation of such rights is therefore inapplicable here as well. (We will consider the

District's own conventional water rights in part V.B.3. *post*.)[28]

The District also relies on *Niles Sand & Gravel Co. v. Alameda County Water*

*Dist.* (1974) 37 Cal.App.3d 924 (*Niles*), an opinion involving a county water district that

sought damages and an injunction to stop a landowner from wasting water. *Niles* does

not aid the District. Although the exact nature of the claims asserted is unclear, the water

district sought to enforce the correlative rights doctrine, which limits the ability of

landowners to use water for nonbeneficial purposes. (*Id.* at p. 933.) The doctrine

imposes an obligation, or servitude, on all overlying landowners in a groundwater basin

"to refrain from discharging more than their reasonable share of the underground water

---

[28]    The District claims its property interests in groundwater were recognized in
*Orange County Water Dist. v. The Arnold Engineering Co., supra*, 196 Cal.App.4th
1110, an opinion in a similar though unrelated action by the District against alleged
groundwater polluters. That opinion considered whether the District was asserting claims
on behalf of the public, which could have called into question the legitimacy of its
contingency fee arrangement with its attorneys. (*Id.* at p. 1123.) The reviewing court,
viewing the complaint as a whole, concluded that the District was suing to protect its own
interests in groundwater and not those of the general public: "Indeed, regardless whether
the Water District's interest in the groundwater is classified as regulatory, proprietary, or
usufructuary, the Water District is entitled to recover monetary damages for the
investigation and remediation costs it incurred and will incur in the future." (*Id.* at pp.
1125-1126, fn. omitted.) The court relied primarily on the District's claims under the
OCWD Act and the HSAA. (196 Cal.App.4th, at p. 1126.) It mentioned negligence and
trespass only in passing, and it called any argument based on public nuisance a "red
herring." (*Id.* at pp. 1125-1126.) It did not engage in a thorough analysis of the District's
property interests in groundwater. We therefore find the District's reliance on this
authority unpersuasive.

therein." (*Id.* at p. 934.) *Niles* held that this servitude was public "because the right to enforce it is held by a public agency [i.e., the water district] as trustee for all surface owners and suppliers of water (i.e., the 'public') in the Niles Basin." (*Id.* at p. 935.) The water district's ability to enforce this public servitude derived *not* from its property interests but from its police powers as a public agency. (*Id.* at pp. 936-937.) Here, by contrast, the District does not seek to exercise any police power. Instead, it asserts common law claims available to public and private plaintiffs alike. *Niles* is inapposite.[29]

For the foregoing reasons, we conclude that the State's delegation of rights in section 39 of the OCWD Act does not confer any property interests in groundwater in the South Basin to the District. The District therefore cannot support a claim for trespass or private nuisance on this basis.

### 2. *Property Interests Based on the District's Regulatory Powers*

The District contends its regulatory powers over the groundwater in the South Basin confer a property interest in the groundwater sufficient to support its trespass and nuisance claims. It points to its power to require registration of water producers (OCWD Act, §§ 24, 35), its power to require installation of a water meter to track the amount of water extracted (*id.*, § 35), its power to impose fees based on that amount (*id.*, §§ 23, 27,

---

[29]    In a footnote, *Niles* states it was "undisputed that the district owns the ground water in the Niles Basin as trustee for all the overlying surface owners located within its boundaries." (*Niles, supra*, 37 Cal.App.3d at p. 929, fn. 5.) *Niles* did not examine that proposition, and, as noted, the water district did not rely on a property interest to bring its claims against the landowner. (*Id.* at pp. 936-937.) To the extent this footnote articulates a general legal principle regarding ownership of groundwater, we disagree for the reasons we have already stated.

29), its power to enjoin unauthorized water producers from extracting water (*id.*, § 32), and its power to regulate the amount of water extracted through fees to encourage responsible water extraction (*id.*, § 31.5). No person other than the District may store water in the Orange County groundwater basin absent agreement by the District, and the District may regulate this storage even when authorized. (*Id.*, § 2.1, subd. (a).) In the District's view, these powers taken together confer on the District the right to control access to groundwater in the Orange County groundwater basin, including both inflows and outflows. The District views the result of these powers as akin to a property interest.

We disagree that the District's regulatory powers over groundwater confer a property interest. As we have discussed above with respect to the State, the power to regulate and supervise is not the same as ownership or other interest in property. (See *City of Barstow, supra*, 23 Cal.4th at p. 1237, fn. 7; *State of California, supra*, 78 Cal.App.4th at p. 1034.) The fact that the District may regulate access to groundwater, for example, does not mean that the District owns the groundwater. The District has cited no authority for the proposition that its regulatory powers confer a property interest, and we are aware of none. The District's argument is unpersuasive.[30]

---

[30]  The District also references the OCWD Act, sections 2 and 8. Section 2, subdivision (9), gives the District the power to bring actions "to prevent interference with water or water rights used or useful to lands within the district, or diminution of the quantity or pollution or contamination of the water supply of the district, . . . or to prevent any interference with the water or water rights used or useful to the district which may engager or damage the inhabitants, lands, or use of water in the district . . . ." This section confers the power to bring litigation; it does not confer any property interests in groundwater. The District has not asserted a stand-alone claim based on section 2 of the OCWD Act, so we need not decide whether it confers any right of action on the District

### 3. *Property Interests Based on the District's Recharge Activities*

The District contends that its efforts to recharge the groundwater in the Orange County groundwater basin confer property interests in the groundwater itself, in the form of water rights. As explained above, the District acquires water from various sources and discharges it (or "spreads" it) at District facilities in Orange County. The process replenishes groundwater in the Orange County groundwater basin. It causes groundwater levels to rise throughout the basin, including in the South Basin, because the entire basin is hydrologically connected. The recharged groundwater is effectively stored in the basin until water producers extract it. The District itself does not use or extract groundwater from the basin.[31]

In this appeal, the District claims it enjoys usufructuary rights to groundwater in the South Basin, but it does not specify with any particularity the type of usufructuary rights (overlying, appropriative, or prescriptive) at issue. Instead, the District argues that its recharge activities store water in the Orange County groundwater basin, that its storage of water is a beneficial use (and allows for additional beneficial uses by others), and that the District thereby has usufructuary rights to groundwater in the basin,

---

separate from generally applicable laws. The District has asserted a claim under section 8, which we discuss separately. (See part III., *ante*.) But Section 8 also does not confer any property interests in groundwater on the District.

[31]    In its opening brief, the District relied on evidence concerning its recharge activities that the trial court excluded. We have already explained that the District forfeited any claims of error as to such exclusion by not raising them until its reply brief. (See fn. 6, *ante*.) The essential facts regarding the District's recharge activities were admitted, however, so the District's broader contention remains viable on appeal.

including in the South Basin. Based on the District's argument, we can conclude the District does not assert overlying or prescriptive rights to groundwater. We will therefore examine the District's potential appropriative rights.

"The appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators." (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 101.) "To constitute an appropriation, three elements must coexist, 'the intent to take, accompanied by some open, physical demonstration of the intent, and for some valuable use' [citation]." (*Fullerton v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 590, 598, italics omitted (*Fullerton*); see *California Trout, Inc. v. State Water Resources Control Bd.* (1979) 90 Cal.App.3d 816, 820.)

It is undisputed that the District does not itself extract or "actual[ly] divert" groundwater from the Orange County groundwater basin. By definition, therefore, the District does not appropriate groundwater in the South Basin. Absent evidence of appropriation, the District generally cannot claim appropriative rights. (See *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925 ["The right of an appropriator depends upon an actual taking of water."]; *Crane v. Stevinson* (1936) 5 Cal.2d 387, 398; *City of Santa Maria, supra*, 211 Cal.App.4th at p. 278.)[32]

---

[32] Because the District does not appropriate water from the South Basin, the parties' dispute over whether storage of groundwater is a beneficial use is irrelevant. The

The District argues that it enjoys an exception to this general rule based on its importation or recharge activities, which deposit water from various sources into the Orange County groundwater basin. The District's argument is based on an appropriator's right to reclaim or re-appropriate water it has imported into a river or groundwater basin (See *City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 260 (*City of Los Angeles II*); *City of Los Angeles v. City of Glendale* (1943) 23 Cal.2d 68, 76 (*City of Los Angeles I*).) For reasons we will explain, and based on the current record, we conclude defendants have not offered undisputed facts sufficient to rebut the District's claim.

By importing water and recharging the Orange County groundwater basin, the District loses its property interest in the imported water itself. (*Stevens v. Oakdale Irrigation Dist.* (1939) 13 Cal.2d 343, 350.) But the District may retain an equivalent right to reclaim or reappropriate water from the basin. "Water which has been appropriated may be turned into the channel of another stream, mingled with its water, and then reclaimed . . . ." (Wat. Code, § 7075.) "The rule codified by this statute applies as well to the addition and withdrawal of water in an underground basin." (*City of Los Angeles II, supra*, 14 Cal.3d at p. 260; see *City of Los Angeles I, supra*, 23 Cal.2d at pp. 76-77.) The rule "allow[s] an appropriator to retain an interest in appropriated water that the appropriator brings from one stream or basin and adds to another." (*City of Santa Maria, supra*, 211 Cal.App.4th at p. 302.)

District's appropriative rights to the water sources from which it obtains water for recharge—which it then uses, beneficially or not, for storage—are not at issue.

92

This rule is intended to encourage the use of natural watercourses and basins for efficient transportation and storage of water. (*City of Los Angeles I, supra*, 23 Cal.2d at pp. 76-77.) As such, the rule applies most often where the addition and withdrawal occur as part of a plan to use the natural watercourse or basin for transportation and storage, i.e., "where the recapture of the water by the person bringing it from [water source] is a part of his original project, and the foreign water was from the beginning turned by him into [the watercourse or underground basin] not simply to get rid of a discharge, but for the express purpose of taking it out again below." (Wiel, *Mingling of Waters* (1915) 29 Harv. L.Rev. 137, 147, cited by *City of Los Angeles I, supra*, 23 Cal.2d at p. 78; see 62 Cal.Jur.3d (2013) Water, § 258, pp. 323-324.)

Crucially, the rule applies only where the water importer intends to reappropriate the imported water: "Such water is not abandoned *where there is an intent to recapture it*." (*Barton Land & Water Co. v. Crafton Water Co.* (1915) 171 Cal. 89, 94, italics added; see 62 Cal.Jur.3d, *supra*, Water, § 593, pp. 729-730.) In explaining its landmark holdings on this subject, the Supreme Court emphasized this intent requirement: "One basis for the holding was the trial court's finding that before commencing the importation of Owens water, plaintiff had formed an intention to recapture the return waters used for irrigation in the San Fernando Valley whenever such return waters were needed for its municipal purposes and the use of its inhabitants, and that the Los Angeles Aqueduct had been planned and located to facilitate the availability and recapture of such return waters. Under these circumstances, plaintiff retained its prior right to the return waters wherever they might appear." (*City of Los Angeles II, supra*, 14 Cal.3d at p. 257; see *id.* at pp. 259-

93

260.) Under certain circumstances, abandonment may also be avoided where the water importer sells or transfers its right to re-appropriate to another person. (See *Stevinson Water Dist. v. Roduner* (1950) 36 Cal.2d 264, 267-268 [enforcing agreement to transfer right to reappropriate imported water]; see also *Richardson v. McNulty* (1864) 24 Cal. 339, 344-346 [distinguishing the concepts of transfer and abandonment in the context of a mining claim].)

This issue, the District's intent to reappropriate, was not a focus of the summary adjudication proceedings in the trial court. We requested supplemental briefing from the parties regarding whether we could conclude, on the current record, that the undisputed facts showed the District did not have sufficient intent to recapture to invoke the rule discussed above and therefore did not enjoy any appropriative water rights in the South Basin. (See *Blackwell v. Vasilas* (2016) 244 Cal.App.4th 160, 167 ["We must affirm the trial court's ruling on any correct legal theory, so long as the parties had an opportunity to address it in either the trial or appellate court."]; *Schmidt, supra*, 223 Cal.App.4th at p. 1498.)

Here, as discussed above, the District does not extract (or reappropriate) any water from the Orange County groundwater basin. Nor does it appear based on the current record that it intends to extract any such water. Instead, replenishment of the groundwater basin is, in and of itself, the purpose for which the District engages in groundwater recharge. Other water producers, not the District, extract and appropriate basin water for their own purposes. The District points out that water producers pay fees to the District based on the amount of water they extract from the basin, but based on the

94

current record these fees appear to be regulatory, not transactional, in nature. It does not appear that the producers are purchasing water or water rights from the District.

However, as the District persuasively argues in its supplemental briefing, defendants did not raise the issue of intent in their motions for summary adjudication or separate statements in support thereof. The District contends it would have offered additional evidence of its intent in the form of testimony from District employees and evidence of transactions, contracts, or other arrangements between the District and water producers relating to the disposition of water or water rights.

Because defendants did not raise the issue of intent in their motions, we conclude the District was not required, nor did it have an adequate opportunity, to develop the factual record and raise triable issues of fact relating to the issue of intent to reappropriate groundwater following its recharge activities. Due process and fundamental fairness require us to refrain from deciding this issue against the District in the absence of such an opportunity. (*Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 152, fn. 9 ["Accordingly, although we have serious doubts whether such triable issues exist in this case, we leave the issue for another case and another day."]; *Folberg v. Clara G.R. Kinney Co.* (1980) 104 Cal.App.3d 136, 140-141.)

We therefore conclude, in this appeal and on the current record only, that defendants have not shown the District does not enjoy appropriative water rights in the South Basin based on its recharge activities. We will next consider whether these appropriative rights are a sufficient basis on which to allege claims for trespass or nuisance under the circumstances here.

95

C. *Appropriative Water Rights and the District's Claims*

1. *Trespass*

Trespass, as we have discussed, protects against the unlawful interference with possession of property. (*Wilson, supra*, 32 Cal.3d at p. 233; *Staples, supra*, 189 Cal.App.3d at p. 1406.) Although appropriative water rights have been described as "possessory property right[s]" (*Fullerton, supra*, 90 Cal.App.3d at p. 599), the trespass cause of action in the real property context has generally been applied to protect possessory property rights in *land* (*Wilson*, at p. 233; *McLeod v. Fox West Coast Theatres Corp.* (1937) 10 Cal.2d 383, 387; *Donahue Schriber Realty Group, Inc. v. Nu Creation Outreach* (2014) 232 Cal.App.4th 1171, 1178; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §§ 693-694). The possession required to maintain a trespass cause of action is most clearly seen in the context of land: "Actual possession is usually evidenced by occupation, by substantial enclosure, by cultivation or by appropriate use according to the particular locality and quality of the property." (*Williams, supra*, 41 Cal.App.3d at p. 508.)

Contamination of subsurface soil has been held to interfere with a landowner's possessory interest in its land. (See, e.g., *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 592; *Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1778 (*Cassinos*).) " 'The essence of the cause of action for trespass is an "unauthorized entry" onto the land of another.' " (*Cassinos*, at p. 1778.) Thus, "causing subsurface migration of fluids into a mineral estate without consent constitutes a trespass." (*Ibid.*)

Here, property interests in land are not at issue. As noted, the District does not own any property in the South Basin. The District's trespass claim must be based, if at all, on the appropriative water rights discussed above. The District has not cited any authority where contamination of water was held to be a trespass against a water right, and we are aware of none. It therefore appears to be an issue of first impression in California.

The Restatement Second of Torts emphasizes that a trespass claim based on water contamination must have a relationship to land: "The pollution of water may be the result of an act constituting a trespass, as in the case of a foreign substance deposited in the water while it is on the land of the plaintiff or deposited upstream and then brought to the land by the stream." (Rest.2d Torts, § 849, com. c.) It classifies harm caused by contamination or pollution of the water itself as a form of nuisance. (*Id.*, § 849, com. e.)

The parties have cited only one case in which interference with a water right was held to be a common law trespass. (See *Fall River Valley Irr. Dist. v. Mt. Shasta Power Corp.* (1927) 202 Cal. 56 (*Fall River*).) In *Fall River*, our Supreme Court considered competing claims to the water flows of the Fall River. (*Id.* at p. 58.) The plaintiff contended it had the right, under permits issued by the State of California, to appropriate a certain amount of Fall River water flows. (*Ibid.*) The defendant denied the validity of the permits and contended it held a riparian right, based on its ownership of abutting lands, to all water naturally flowing in the Fall River. (*Ibid.*) In rejecting the plaintiff's contention, the Supreme Court held that "a mere appropriator, until he obtains title by prescription, is, as against the right of a riparian owner, a trespasser." (*Id.* at p. 70.) " 'As

97

to a nonriparian owner the riparian owner is under no duty to share the waters of the creek and the slightest use by such nonriparian owner diminishes to some extent the flow of the stream.' " (*Id.* at p. 71.)

Although the rights of riparian owners have subsequently been limited by an amendment to our State Constitution, *Fall River*'s characterization of unauthorized water users as trespassers remains valid. (*Orange Cnty. Water Dist. v. City of Riverside* (1959) 173 Cal.App.2d 137, 166.) And the principle that the unauthorized diversion or use of water may be a trespass is codified by statute and has been applied in a number of authorities. (Wat. Code, § 1052, subd. (a); see, e.g., *People v. Shirokow, supra*, 26 Cal.3d at p. 304; *Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 895-896.) But neither *Fall River* nor that statute support a cause of action for trespass under the circumstances here. The District has not been deprived, or dispossessed, of any quantity of water to which it is entitled. Its water rights also do not depend on land ownership, as did the riparian rights claimed in *Fall River*. As such, these authorities have little relevance to the District's claim.[33]

---

[33] The District's reliance on *Niles, supra*, 37 Cal.App.3d 924, is unpersuasive for the reasons we have already discussed above. *Niles* did not involve a trespass claim; the lawsuit was instead a product of the plaintiff's police power as a public agency. (*Id.* at pp. 936-937.) The District also cites an opinion from New York's highest court for the proposition that an unreasonable use of water may constitute a trespass. (See *Forbell v. New York* (1900) 164 N.Y. 522.) But the District misreads *Forbell*. In that case, the plaintiff was a landowner who was deprived of his natural supply of underground water by the large wells and waterworks constructed by the defendant, a neighboring landowner. (*Id.* at p. 524.) The court held that the defendant's activities were unreasonable: "But to fit [the neighboring land] up with wells and pumps of such pervasive and potential reach that from their base the defendant can tap the water stored

The alleged trespass here consists of contamination of groundwater in the South Basin, some of which has been extracted by a well operated by the water producer IRWD.  Water in its natural state, before it is appropriated or otherwise captured, cannot be owned or possessed by any private person.  (*State of California, supra*, 78 Cal.App.4th at p. 1025; see *Davis, supra*, 3 Cal.App.5th at p. 714.)  As such, its contamination, without additional facts, cannot constitute a trespass.  The additional facts here consist of the District's potential appropriative water rights throughout the Orange County groundwater basin based on its recharge activities.  These appropriative rights are merely usufructuary, i.e., they confer the right to use water.  They do not confer a right to possess any specific corpus of water.  (*Audubon Society, supra*, 33 Cal.3d at p. 441.)  The District's appropriative rights, based on its recharge activities, do not have a sufficient nexus with the alleged contaminated water in the South Basin to establish a possessory property interest that can support a cause of action for trespass.[34]  Even accepting that

in the plaintiff's land, and in all the region thereabout, and lead it to his own land, and by merchandising it prevent its return, is, however reasonable it may appear to the defendant and its customers, unreasonable as to the plaintiff and the others whose lands are thus clandestinely sapped, and their value impaired."  (*Id.* at p. 526.)  Analogizing the defendant's activities to an uncontrolled explosion, the court affirmed the trial court's finding that defendant had committed a trespass by applying force to plaintiff's land and thereby impairing its value.  (*Ibid.*)  Like *Fall River*, *Forbell* has no application here.  The District does not assert any impairment of its interest in land, nor does the District allege it has been dispossessed of any water to which it was entitled.  *Forbell* does not support a cause of action for trespass under the circumstances here.

34      The District also alleges that its recharge activities prevent saltwater intrusion from the Pacific Ocean into groundwater.  We disagree that this additional benefit has any significance for the District's trespass and nuisance claims.  In particular, we disagree that this benefit can be analogized to a physical fence around a plot of land that would be

appropriate water rights are possessory in some sense, it is clear that the District's rights do not confer any meaningful right of possession on the any corpus of contaminated water in the South Basin. Nor do the District's activities show that it possesses any water in the South Basin. (See *Williams, supra*, 41 Cal.App.3d at p. 508.) The District's trespass claim, based on some future exercise of appropriative rights that could result in the extraction of contaminated water, is wholly speculative and cannot be supported on the undisputed facts here.[35]

For the foregoing reasons, even accepting that the District has appropriative water rights in groundwater in the Orange County basin, the District does not have a possessory property right sufficient to support a claim for trespass on the facts here. Summary adjudication of that claim against the District was therefore appropriate.

### 2. *Nuisance*

A nuisance is "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." (Civ. Code, § 3479.) "The basic concept underlying the law of nuisances is articulated in the ancient maxim *sic utere tuo ut alienum non laedas*, that is, so use your own as not to injure another's

---

evidence of possession. (Cf. *Williams, supra*, 41 Cal.App.3d at p. 508 [evidence of an enclosure of land is "evidence tending to show possession" in a trespass cause of action].) We also disagree that the District's regulatory powers confer any right of possession for reasons we have discussed in part V.B.2., *ante*.

35    We need not consider whether a trespass claim would be viable if the District were extracting or capturing water in the South Basin that was contaminated.

property."  (*Lussier v. San Fernando Valley Water Dist.* (1988) 206 Cal.App.3d 92, 100.)

"More specifically an action for a private nuisance is designed to redress a substantial and unreasonable invasion of one's interest in the free use and enjoyment of one's property."  (*Ibid.*, fn. omitted.)

As noted, a cause of action for nuisance under a theory of private nuisance requires a plaintiff to show inference with the use or enjoyment of a property interest.  Unlike for trespass, however, interference with a *possessory* property interest is not required:  " '[A]ny interest sufficient to be dignified as a property right' will support an action based on a private nuisance . . . ."  (*Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 125 (*Venuto*).)  Nor is a connection to land a generally necessary element.  (See *Institoris, supra*, 210 Cal.App.3d at p. 20 ["[A] private nuisance will support recovery not simply for a disturbance of land, but also for interference with any interest sufficient to be dignified as a property right."].)

Defendants argue the District did not have any relevant property interests in the South Basin because it did not use any groundwater there.  We disagree.  As we have explained above, the District may have appropriative water rights based on its recharge activities.  Appropriative water rights are property rights, and they are therefore sufficient to support a claim of private nuisance.  Moreover, although the undisputed facts show that the District does not use its appropriative water rights to extract or produce water, we conclude defendants have not shown there are no triable issues of material fact regarding other uses of those rights or the District's enjoyment of them.  Defendants are not entitled

101

to summary adjudication of the District's nuisance claim based on a theory of private nuisance.

A property interest sufficient to support a cause of action for private nuisance is generally sufficient to support a cause of action for public nuisance as well. (*Venuto, supra*, 22 Cal.App.3d at pp. 124-125.) Given our conclusion that the District has a property interest sufficient to support a nuisance cause of action, we need not consider whether the District could assert a cause of action even in the absence of that property interest, i.e., based solely on its special injury. (*Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1551 ["[W]hen the nuisance is a private as well as a public one, there is no requirement the plaintiff suffer damage different in kind from that suffered by the general public."]; *Venuto*, at pp. 124-125.) We therefore need not consider whether the District could maintain a cause of action for nuisance based solely on a special injury unrelated to property. (See *In re Firearm Cases, supra*, 126 Cal.App.4th at p. 987, fn. 21.)

The trial court identified several additional grounds supporting its order grounding summary adjudication of this cause of action, including the District's inability to show a substantial and unreasonable harm sufficient to support a nuisance and Gallade's showing of overlying water rights in the South Basin. The District claims error in each of these grounds; defendants do not respond. We agree with the District that these grounds cannot support summary adjudication. The evidence of widespread VOC contamination in groundwater raises a triable issue of material fact regarding the issue of substantial and unreasonable harm. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1105; *Monks*

*v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 303.) And Gallade's

overlying water rights do not excuse its alleged creation of a nuisance.

For the foregoing reasons, the trial court erred by granting defendants' motions for

summary adjudication of the District's cause of action for nuisance. With the exception

of UCI, we will reverse the judgments as to the District's nuisance claim.[36]

## VI. *Declaratory Relief*

The trial court rejected the District's declaratory relief cause of action, either

through summary adjudication, judgment on the pleadings, or following trial, based on

the District's inability to maintain any other, coercive causes of action. The District

contends that the judgment as to its cause of action for declaratory relief should be

reversed if the judgments as to any of its other causes of action is reversed. Defendants

do not address this contention, except to argue that the judgments as to the other causes

of action should be affirmed.

---

[36]    UCI obtained summary adjudication of the District's nuisance claim on the alternate ground of causation. The District does not offer any additional claims of error with respect to this cause of action that we have not already discussed with respect to its causes of action against UCI under the OCWD Act and for negligence. (See parts III.B. and IV.B., *ante*.) The District's contentions remain unpersuasive, so we will affirm the judgment against the District on its nuisance cause of action as to UCI on the alternate ground of causation. Ricoh's contention that the judgment as to it should be affirmed on the alternate ground of causation is unpersuasive as well. The court did not summarily adjudicate the District's nuisance cause of action against Ricoh on site-specific causation grounds, and Ricoh has offered no argument why it should have. (See part II.B.4., *ante*.) Steelcase's contention that the trial court should have granted summary adjudication of its nuisance claim is unpersuasive for the same reasons we have already discussed. (See part II.B.6., *ante*.)

We agree with the District. The District's cause of action for declaratory relief incorporates the allegations of its other causes of action and requests a declaration of the parties' respective financial obligations stemming from the same facts. Because the District may maintain at least one other cause of action against each defendant, it may also maintain its declaratory relief cause of action. (See *Southern Counties Gas Co. v. Ventura Pipeline Constr. Co.* (1971) 19 Cal.App.3d 372, 381.) Declaratory relief may be sought in addition to other, coercive remedies. (Code Civ. Proc., § 1062.) In light of our conclusion, we need not address the parties' other, subsidiary arguments regarding declaratory relief.

## DISPOSITION

The judgments involving Beatrice, Bell, BorgWarner, DRSS, Emerson, Gallade, GE, ICI, Marotta, Ricoh, SABIC, Sanmina, and UNISYS are affirmed in part as to the District's cause of action for trespass and reversed in part as to the District's causes of action under the OCWD Act, the HSAA, and for negligence, nuisance, and declaratory relief.

The judgment involving GE Aviation is affirmed in part as to the District's causes of action for negligence and trespass and reversed in part as to the District's causes of action under the OCWD Act, the HSAA, and for nuisance and declaratory relief.

The judgment involving UCI is affirmed in part as to the District's causes of action under the OCWD Act and for negligence, trespass, and nuisance and reversed in part as to the District's causes of action under the HSAA and for declaratory relief.

The joint judgment involving Accurate Circuit, Brenntag, Dyer, Embee, ITT, Soco West, and Steelcase is affirmed in part as to the District's cause of action for trespass and reversed in part as to the District's causes of action under the OCWD Act, the HSAA, and for negligence, nuisance and declaratory relief.

In the interests of justice, the parties shall bear their own costs on appeal.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.